FILED
**United States Court of Appeals
Tenth Circuit**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

**February 9, 2022**

**Christopher M. Wolpert
Clerk of Court**

AHMAD AJAJ,

    Plaintiff - Appellant,

v.

FEDERAL BUREAU OF PRISONS;
CALVIN JOHNSON, Associate Warden,
in his individual capacity; D. PARRY,
Officer, in his individual capacity;
SAMANTHA MCCOIC, Medical Staff, in
her individual capacity; JOHN OLIVER,
Warden, in his individual capacity; DAVID
B. BERKEBILE, Warden, in his individual
capacity; TARA HALL, Associate
Warden, in her individual capacity;
GEORGE KNOX, Religious Counselor, in
his individual capacity; RONALD
CAMACHO, Physician Assistant, in his
individual capacity,

    Defendants - Appellees,

and

BILL TRUE, Warden, in his official
capacity; CHRIS LAMB, Associate
Warden, in his official capacity; K.
MORROW, Medical Staff, in her official
capacity; MICHAEL CASTLE, Chaplain,
in his official capacity; JASON
HENDERSON, Chaplain, in his official
capacity; KENNETH CRANK, Inmate
Trust Fund Supervisor, in his official
capacity; ROGER HUDDLESTON, Nurse,
in his official capacity; D. PARRY,

No. 19-1250

Officer, in his official capacity; UNITED
STATES OF AMERICA,

　　　Defendants.

------------------------------

MUSLIM ADVOCATES; RODERICK
AND SOLANGE MACARTTHUR
JUSTICE CENTER,

　　　Amici Curiae.

_____

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 1:15-CV-00992-RBJ-KLM)**

_____

Julieanne Buchanan (Nicole B. Godfrey, Danielle C. Jefferis, Aurora L. Randolph, Laura Rovner and student attorneys Denver Donchez, Katie Heideman, Hunger Ross, Andrew Shulman, and Zoë Williams, with her on the briefs), University of Denver Sturm College of Law Civil Rights Clinic, Denver, Colorado, for the Appellant.

Karl L. Schock, Assistant United States Attorney (Matthew T. Kirsch, Acting United States Attorney, with him on the brief), for the Appellee.

John J. Clarke, Jr., Caroline Fish, Micha Chavin, and Sean Newland, DLA Piper LLP (US), New York, New York, and Sacramento, California, filed a brief for Amicus Curiae Roderick and Solange MacArthur Justice Center.

Matthew W. Callahan filed a brief for Amicus Curiae Muslim Advocates, Washington, D.C.

_____

Before **HARTZ**, **BACHARACH**, and **ROSSMAN**, Circuit Judges.

_____

**HARTZ**, Circuit Judge.

_____

2

Ahmad Ajaj, a practicing Muslim, is a Bureau of Prisons (BOP) inmate serving a 114-year sentence for terrorist acts connected with the 1993 World Trade Center bombing. Mr. Ajaj sued to obtain injunctive relief against BOP and damages from BOP officials on several grounds, including violations of his rights to free exercise of religion under the Religious Freedom Restoration Act (RFRA), 42 U.S.C. § 2000bb et seq. The United States District Court for the District of Colorado dismissed his claims, and Mr. Ajaj has appealed. He contends that the district court erred by holding (1) that his claim against the BOP for denial of his right to group prayer was moot and (2) that RFRA did not provide a claim for damages against government officials in their individual capacities. Exercising jurisdiction under 28 U.S.C. § 1291, we agree with Mr. Ajaj and reverse the challenged rulings. The mootness ruling was based on a misconception of the evidence of Mr. Ajaj's prison conditions. And the Supreme Court has now ruled in *Tanzin v. Tanvir*, 141 S. Ct. 486, 489 (2020), that damages claims are permissible under RFRA. The parties have also asked us to consider, in light of *Tanzin*, whether the individual defendants can escape liability through the defense of qualified immunity. We reject Mr. Ajaj's contention that the doctrine of qualified immunity is inapplicable to RFRA claims, but we decline to resolve whether the individual defendants in this case have shown entitlement to qualified immunity, leaving that matter to the district court in the first instance.

### I.    BACKGROUND

From 2012 to 2017 Mr. Ajaj was incarcerated at the United States Penitentiary, Administrative Maximum (ADX) in Florence, Colorado. In 2012, ADX accommodated Mr. Ajaj's request to fast during the month of Ramadan by delivering his medications outside of fasting hours. Ramadan is an Islamic holy month during which Muslims refrain from ingesting anything—including medication—from sunrise to sunset, provided there are no adverse health effects. Between 2013 and 2015, ADX refused to provide Mr. Ajaj the same accommodation.

After ADX denied Mr. Ajaj's request for adjusted medication delivery for Ramadan in May 2015, Mr. Ajaj filed suit against the BOP and the then-ADX warden John Oliver for violating his rights to free exercise of religion under the First Amendment and RFRA. RFRA prohibits the federal government from substantially burdening an individual's exercise of religion unless the application of that burden is the least restrictive means of furthering a compelling governmental interest. *See* 42 U.S.C. §§ 2000bb–1, 2000bb–2. Shortly after Mr. Ajaj filed suit, ADX amended its policies to provide for medication distribution outside of Ramadan fasting hours and moved to dismiss Mr. Ajaj's claim as moot.

Later that year Mr. Ajaj filed an amended complaint, alleging that ADX's policy change on medications had been only temporary, naming additional officials as defendants, and adding several other claims under the First and Fifth Amendments, RFRA, and the Federal Tort Claims Act. Relevant to this appeal, he sought injunctive relief against the BOP and monetary relief against BOP officials in their individual

capacities based on the following alleged violations of RFRA: (1) failure to accommodate religious fasts during Ramadan and additional fasts on certain other days prescribed by Islamic tradition throughout the year, referred to as Sunnah fasts; (2) failure to provide access to a religiously compliant halal[1] diet; (3) failure to provide access to an Islamic religious leader (an imam); and (4) failure to accommodate religiously mandated group prayer five times daily. Mr. Ajaj sought injunctive relief relating not just to ADX but also against "BOP staff at all facilities BOP places Mr. Ajaj in." J. App., Vol. 1 at 153–54.

The defendants moved to dismiss on a variety of grounds. The only ones raised by the BOP that we need mention are that the RFRA Ramadan medicine-administration claim was moot in light of ADX's policy change and that Mr. Ajaj failed to make plausible allegations that its other conduct violated RFRA. And the only ones raised by the individual defendants that we need mention are that RFRA does not authorize money damages against officials sued in their individual capacities and that even if it did, all the individual defendants would be entitled to qualified immunity.

The district court agreed with the first ground raised by BOP, dismissing Mr. Ajaj's claims regarding his Ramadan fasts because ADX had updated its medication-distribution policies to accommodate Ramadan. And it dismissed with

---

[1] "'[H]alal' means 'permitted.' Fruits and vegetables are always permitted. Items that are not permitted include[] pork, meat not slaughtered in an approved manner, carrion and alcohol." District Ct. Findings, Conclusions and Order of Judgment, 9/13/18, J. App., Vol. 19 at 3706.

prejudice all of Mr. Ajaj's RFRA claims against the individual-capacity defendants because it concluded that RFRA's text and history suggest that money damages are not available in individual-capacity suits. (It did not address the qualified-immunity issue.) The case proceeded, however, on Mr. Ajaj's claims for injunctive relief against the BOP regarding medication distribution for his Sunnah fasts, access to a halal diet, access to an imam, and participation in group prayer.

The parties engaged in settlement negotiations from May to July 2017. After those negotiations failed, the BOP moved Mr. Ajaj into the final phase of ADX's Step-Down Program—a 24-month program for inmates to demonstrate they can function in less restrictive prisons—at USP [United States Penitentiary]-Florence. Mr. Ajaj was then transferred to a facility in Indiana, USP Terre Haute, in January 2018. He was placed in the Life Connections Program (LCP), "a faith-based life skills program in which participants are taught to take their basic faith teachings and integrate them into their lives so they can make healthy connections to their family and their community." District Ct. Findings, Conclusions, and Order of Judgment 9/13/18, J. App., Vol. 19 at 3708. After the transfer to Terre Haute, the BOP moved to dismiss Mr. Ajaj's remaining RFRA claims as moot because they were all directed at ADX (where he was no longer housed) and the general practices, security needs, and personnel at Terre Haute—and, in particular, the special treatment available in the LCP—are substantially different from those at ADX. For example, inmates in the LCP are allowed to pray together in a designated classroom when they are outside their cells whereas Mr. Ajaj alleged that group prayer is prohibited at ADX.

Mr. Ajaj opposed the motion on several grounds. First, he maintained that his transfer did not resolve any of his RFRA claims: Medication delivery at Terre Haute still did not accommodate his Sunnah fasts. Terre Haute did not provide a halal menu; indeed Mr. Ajaj alleged that no BOP institution provided a halal-certified menu. He still did not have access to an imam despite his requests to arrange meetings, including with imams at other BOP facilities by video or telephone. And although LCP allowed him to pray with others in a designated area when inmates were outside their cells, he still was not able to pray with others five times daily.

Mr. Ajaj further argued that even if his claims were moot after his transfer, the voluntary-cessation and capable-of-repetition-yet-evading-review exceptions to mootness applied. He remained "confined to a BOP facility, subject to BOP policies, and suffering violations of his religious rights." Pl.'s Resp. to Summ. Judgment Mot., J. App., Vol. 14 at 2474. Although the LCP offered some relief by providing Mr. Ajaj greater opportunity to exercise his religion, the BOP remained free to move him out of the program, or transfer him to a different facility at any time; and the BOP had not demonstrated that any system-wide policy changes would protect him from similar deprivation at a future facility. Indeed, Mr. Ajaj argued that his transfer out of the LCP was likely because it is typically an 18-month assignment for inmates with 24–36 months left in their sentence; it is, according to Mr. Ajaj, "never a permanent home for any federal prisoner." *Id.* at 2470. The BOP, however, represented that inmates can stay in the LCP beyond 18 months if they continue to contribute to the program.

The district court rendered a split decision. It granted the BOP's motion to dismiss with respect to those injunction claims relating specifically to procedures at ADX, explaining that Mr. Ajaj no longer "ha[d] standing" to enjoin practices at a facility where he was not an inmate. J. App., Vol. 17 at 3358. And it dismissed his group-prayer claim, ruling that he "no longer ha[d] standing to challenge BOP policies regarding communal prayer" because he was apparently able to pray with others five times daily in the LCP. *Id.* at 3359. But Mr. Ajaj's claims regarding Sunnah fasts, access to halal foods, and his ability to see an imam could proceed because he alleged that he continued to be deprived of them in the LCP.

In September 2018, after dismissal of Mr. Ajaj's Sunnah-fast claim for lack of preservation, the only remaining claims—seeking injunctive relief against the BOP based on lack of access to a halal diet and an imam—were set for bench trial on the merits. In the days before trial, Terre Haute began offering Mr. Ajaj halal meals after successfully contracting with a local vendor of halal-certified foods. After trial the district court enjoined the BOP from discontinuing Mr. Ajaj's halal diet "absent a very good penological reason." J. App., Vol. 19 at 3711. But it held that his access to an imam had not been "substantially burden[ed]" under RFRA, 42 U.S.C. § 2000bb–1, because Terre Haute had since hired a temporary imam, although not of his denomination, and it was trying to hire a suitable full-time imam.

8

Less than six months after the judgment, Mr. Ajaj was transferred to USP-Allenwood in Pennsylvania.[2] Mr. Ajaj moved for relief from the order dismissing as moot his group-prayer claim because Allenwood allowed group prayer only twice a week. Shortly thereafter, Allenwood changed its policy to allow inmates to pray together whenever they are outside their cells. As a result, the district court denied Mr. Ajaj's motion to revive his group-prayer claim.

On appeal Mr. Ajaj asks this court to reverse (1) the dismissal of his group-prayer claim as moot and (2) the dismissal of his individual-capacity claims for money damages. After the parties completed briefing in this court, Mr. Ajaj was transferred to USP-Coleman I in Sumterville, Florida, which had a policy prohibiting all group prayer. Mr. Ajaj moved to supplement the record on appeal with information about his experience at Coleman I, as well as his lack of consistent access to group prayer at Allenwood. The BOP opposes the motion and urges this court to confine its review to the record before the district court at the time of dismissal.

## II.    DISCUSSION

Mr. Ajaj first argues that the district court erred in dismissing his group-prayer claim as moot after he was transferred to LCP at Terre Haute because any relief offered by the transfer was inadequate and temporary. Next, he argues that the district court's decision to dismiss his individual-capacity claims must be reversed

---

[2] BOP states that Mr. Ajaj was transferred for threatening a nurse. Mr. Ajaj disputes this allegation.

because the recent Supreme Court decision in *Tanzin v. Tanvir*, 141 S. Ct. 486 (2020)—handed down after the district court judgment—held that RFRA does authorize money damages. He further urges this court to reject the BOP's alternative argument for affirmance on grounds of qualified immunity because qualified immunity is inapplicable to RFRA suits. We begin by addressing mootness.

### A.    Mootness of the Group-Prayer Claim

We review questions of constitutional mootness de novo. *See Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1109 (10th Cir. 2010). But as is generally the case in matters of subject-matter jurisdiction, underlying findings of fact are reviewed for clear error, viewing the evidence in the light most favorable to the district court's ruling. *See Butler v. Kempthorne*, 532 F.3d 1108, 1110 (10th Cir. 2008).

"Federal courts only have jurisdiction to consider live, concrete cases or controversies." *Rezaq v. Nalley*, 677 F.3d 1001, 1008 (10th Cir. 2012). The mootness doctrine thus "focuses upon whether a definite controversy exists throughout the litigation and whether conclusive relief may still be conferred by the court despite the lapse of time and any change of circumstances that may have occurred since the commencement of the action." *Jordan v. Sosa*, 654 F.3d 1012, 1024 (10th Cir. 2011) (internal quotation marks omitted). "A case is not moot when there is *some* possible remedy, even a partial remedy or one not requested by the plaintiff." *Rezaq*, 677 F.3d at 1010.

10

After Mr. Ajaj was transferred from ADX to Terre Haute, the district court dismissed his group-prayer claim as moot because the LCP allowed group prayer. It explained:

> Mr. Ajaj *no longer has standing* to challenge BOP policies regarding communal prayer. Mr. Ajaj is apparently now able to pray communally at Terre Haute. The Life Connections Program allows him special access to religious activities including group prayer. Mr. Ajaj argues that the program only lasts 18 months, and therefore, his "short-term access to the unique opportunity" to participate in group prayer is not a reliable resolution of his claim. However, BOP represents that "inmates often remain in the program after their graduation, serving as a teacher or mentor to other inmates." As such, there is not an imminent risk that Mr. Ajaj's ability to participate in this program (and therefore group prayer) will end in the near future. *The only concrete fact is that Mr. Ajaj is currently allowed to pray five times daily in a group setting at Terre Haute, and as such he suffers no injury-in-fact with regard to this policy or procedure.* He therefore does not have standing to seek injunctive relief.

J. App., Vol. 17 at 3359 (citations omitted) (emphasis added).

Mr. Ajaj makes three arguments against dismissal. First, as a threshold matter, he maintains that the district court erred by performing a standing, rather than mootness, analysis. We agree with Mr. Ajaj that standing and mootness are distinct concepts. It is true that they are quite similar. Indeed, mootness has often been characterized as "standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." *Prison Legal News v. Fed. Bureau of Prisons*, 944 F.3d 868, 879 (10th Cir. 2019) (internal quotation marks omitted). But that characterization is not totally accurate. As the Supreme Court has noted, (1) there is at least one exception to mootness (when the terminated action is capable of

11

repetition yet evading review) that has no counterpart in standing doctrine and (2) the defendant has the burden of proving mootness while the plaintiff must establish standing, and the likelihood of future action by the defendant may be too speculative for standing but not to overcome mootness. *See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189–90 (2000).

We question whether the district court misconceived what it needed to determine in resolving mootness. We need not answer that question, however, because we must reverse the district court's mootness ruling anyway on the ground that it was based on a misunderstanding of the facts. Mr. Ajaj argues that his claim was not rendered moot by his transfer to LCP because he still was not able to pray with others five times daily, and the court could therefore grant him meaningful relief. The district court rejected this argument below, stating that it was a "concrete fact" that Mr. Ajaj was "allowed to pray five times daily in a group setting." J. App., Vol. 17 at 3359. But the record is to the contrary.

First, the BOP never represented that Mr. Ajaj could pray with others *five times daily* in the LCP. It said only that his access to group prayer was significantly greater than it was at ADX. The thrust of the BOP's motion to dismiss was that Terre Haute should be the proper subject of a new claim (that first needed to be administratively exhausted) for prospective relief after Mr. Ajaj's transfer, and that the differences between the practices and circumstances at the two facilities were significant. Namely, whereas Mr. Ajaj alleged that he did not have access to any group prayer at all at ADX, the LCP "allowed [him] to pray in congregation with

12

other Muslim inmates *multiple times a day, whenever he is outside his cell in his housing unit.*" J. App., Vol. 13 at 2051 (emphasis added). The BOP cited an internal LCP memorandum stating that a designated classroom "may be used for group prayer during times when inmates are out of their cells," including the five Islamic prayers "daily if possible" and Christian prayers from 8 to 9 PM "nightly." J. App., Vol. 14 at 2431. In addition, the BOP said that even Mr. Ajaj himself acknowledged that he could pray with others in the LCP and that his grievances now focused on the fact that "he cannot pray *as frequently* as he wants." J. App., Vol. 13 at 2052 (emphasis added).

Opposing the BOP's motion to dismiss, Mr. Ajaj submitted a declaration stating that LCP inmates were usually able to pray together only about three times per day because they could access the designated classroom only when it was not being used for classes or other group prayers. Mr. Ajaj's ability to pray with others was further restricted by the limits on the hours that inmates were allowed outside their cells. *See* J. App., Vol. 14 at 2419 (declaration of Terre Haute chaplain stating that "[d]epending on schedules and the time of year, Muslim inmates can frequently pray four of the five daily prayers of the Islamic faith in a group."). As additional support for Mr. Ajaj's factual allegations, his motion for partial reconsideration—which argued that the district court's finding that he could pray with others five times daily was "contrary to the record evidence presented by the parties," J. App., Vol. 17 at 3366—included the following statement at the request of the BOP after the parties conferred about the motion:

> The BOP opposes the motion for reconsideration because the Court
> correctly recognized that *Mr. Ajaj now has access to significant group
> prayer opportunities* in the Life Connections Program. As explained in the
> BOP's briefing, Mr. Ajaj can pray with others when he is outside of his
> cell, *up to five times per day depending on the time of year* . . . . Mr. Ajaj
> *may not be able to pray the first or last of the five daily prayers* at those
> times of the year when the sun rises before inmates are released from their
> cells at approximately 6 a.m., or sets after the inmates are returned to their
> cells at approximately 9 p.m.

J. App., Vol. 17 at 3365.[3] And the BOP's brief on appeal suggests that Mr. Ajaj could

pray with others at Terre Haute "typically for four of the five daily prayers of the

Islamic faith." Aplee. Br. at 23.

Although missing one or two daily prayers might be considered a permissible

burden on Mr. Ajaj's religious beliefs, that goes to the merits of his RFRA claim, not

its justiciability. Mr. Ajaj's group-prayer claim has been founded on his belief that he

must pray with others *five times daily*; and the record does not support that it was a

"concrete fact" that he could do so in the LCP. District Ct. Order, J. App., Vol. 17

at 3359. We therefore must reverse the dismissal of Mr. Ajaj's group-prayer claim as

moot because it was based on a clearly erroneous finding that Mr. Ajaj could pray

with others five times daily.

Accordingly, we need not address Mr. Ajaj's third argument regarding

mootness, which claims an exception to mootness based on the alleged temporary

---

[3] At a hearing during which Mr. Ajaj's motion for partial reconsideration was addressed at some length, the district court appeared to accept that Mr. Ajaj was not always able to pray five times per day at Terre Haute; but neither at the hearing nor in the order denying the motion did the court explain why it nevertheless denied the motion.

14

nature of his placement in the LCP. Also, we deny as moot his related motion to supplement the record with evidence of interim events in support of his voluntary-cessation arguments.[4]

### B.    Individual-Capacity Suits Under RFRA

In addition to bringing claims for injunctive relief against the BOP, Mr. Ajaj also sued several BOP officials in their individual capacities for money damages for refusing to (1) accommodate his Ramadan and Sunnah fasting practices; (2) provide access to a religiously compliant halal diet; (3) provide pastoral visitation with an imam; and (4) allow him to pray with others.

---

[4] After the parties completed briefing in this court, Mr. Ajaj was again transferred to a new facility—Coleman I in Sumterville, Florida. Upon arrival he received a handbook that contained an explicit prohibition against group prayer. He moved to supplement the record on appeal with the handbook and his declaration that he has not had consistent or reliable access to group prayer in any facility to which he has been assigned since ADX. BOP represents that this policy has since been rescinded and urges us to limit our review to the record before the district court at the time of dismissal. There is precedent in our circuit indicating that postjudgment supplementation for the purpose of showing that a case is not moot, rather than to show that a case has become moot on appeal, may be improper. *See Rio Grande Silvery Minnow*, 601 F.3d at 1110 n.11 (10th Cir. 2010) ("This court will not consider material outside the record before the district court" where a party offered supplemental evidence to support the district court's determination that the case was not moot and that the defendant's injurious conduct was likely to recur. (internal quotation marks omitted)). *But see EEOC v. CollegeAmerica Denver, Inc.*, 869 F.3d 1171, 1174 n.6 (10th Cir. 2017) (considering postjudgment developments and concluding that intervening events made clear that a live case or controversy persisted without needing to "decide whether the district court was right to dismiss the claim based on the record as it then existed"). On remand the district court is free to consider Mr. Ajaj's changed circumstances as it did when it continued proceedings for some RFRA claims after he was transferred from ADX to Terre Haute.

The district court dismissed all the RFRA claims against the individual-capacity defendants, holding that RFRA did not authorize money damages. While this appeal was pending, however, the Supreme Court held that money damages are available under RFRA. *See Tanzin*, 141 S. Ct. at 489. Recognizing that they can no longer defend the ground relied on by the district court in dismissing the individual-capacity RFRA claims, the individual defendants now urge this court to affirm on the alternative ground of qualified immunity—which the district court never reached but both sides briefed below. Mr. Ajaj has submitted a supplemental brief arguing that qualified immunity does not apply to RFRA claims.

We hold that qualified immunity can be invoked by officials sued in their individual capacities for money damages under RFRA. We decline, however, to opine on the merits of the defense in this case, leaving it to the district court in the first instance to determine whether it defeats any of Mr. Ajaj's claims. We proceed to explain.

The defense of qualified immunity is a judicially recognized doctrine that shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The doctrine represents a balance between two competing values: providing an avenue to hold officials accountable for constitutional or statutory violations and limiting the social costs arising from the threat of personal liability for official conduct. *See id.* at 813–14. In addition to creating the expense of litigation,

16

individual-capacity suits can raise several other concerns: They may divert officials'

energy from public matters and duties, they may deter individuals from pursuing

public office, and their prospect may induce excessive caution in "all but the most

resolute, or the most irresponsible" in carrying out official duties. *Id.* at 814 (internal

quotation marks omitted). Because these considerations are present regardless of the

cause of action against the official, qualified immunity "represents the norm" in suits

against public officials. *Id*. at 807. Accordingly, many circuits have applied qualified

immunity to individual-capacity suits under a variety of statutes, including RFRA.

*See, e.g.*, *Werner v. McCotter*, 49 F.3d 1476, 1481–82 (10th Cir. 1995) (applying

qualified immunity to state officials sued under RFRA before RFRA was limited to

apply only to federal officials), *superseded by statute on other grounds as stated in*

*Williams v. Wilkinson*, 645 F. App'x 692 (10th Cir. 2016); *Lebron v. Rumsfeld*, 670

F.3d 540, 557 (4th Cir. 2012) (RFRA); *Padilla v. Yoo*, 678 F.3d 748, 756–57, 768

(9th Cir. 2012) (RFRA); *Davila v. Gladden*, 777 F.3d 1198, 1210 (11th Cir. 2015)

(declining to address whether RFRA authorizes individual-capacity suits for money

damages because defendants would in any event be entitled to qualified immunity);

*see also Gonzalez v. Lee Cnty. Hous. Auth.*, 161 F.3d 1290, 1299–1300, 1300 n.34

(11th Cir. 1998) (collecting 11 opinions from eight circuits recognizing qualified-

immunity defense under eight different federal statutes); *Tapley v. Collins*, 211 F.3d

1210, 1214–16, 1215 n.9 (11th Cir. 2000) (same; also deciding that good-faith

defense in Fair Housing Act did not abrogate qualified-immunity defense).

Mr. Ajaj nevertheless contends that the analysis in *Tanzin* establishes that RFRA does not recognize a qualified-immunity defense to damages liability. We beg to differ. The very analysis that supported recognition of the damages claim also compels recognition of qualified immunity.

To begin with, *Tanzin* stated that "[t]he legal backdrop against which Congress enacted RFRA confirms the propriety of individual-capacity suits." 141 S. Ct. at 490 (internal quotation marks omitted). It pointed out that the RFRA language *persons acting under color of law* "draws on one of the most well-known civil rights statutes: 42 U.S.C. § 1983," and the Court had "long interpreted it to permit suits against officials in their individual capacities." *Id.* For present purposes we should also note that damages claims under § 1983 have also long been subject to the defense of qualified immunity.

But there is much more. RFRA provides a right to seek "appropriate relief." 42 U.S.C. § 2000bb–1(c). *Tanzin* said that the meaning of this "open-ended" language is "inherently context dependent." 141 S. Ct. at 491 (internal quotation marks omitted). The relevant context was "suits against Government officials." *Id.* And "[b]y the time Congress enacted RFRA, [the Supreme] Court had interpreted the modern version of § 1983 to permit monetary recovery against officials who violated 'clearly established' federal law." *Id.* Thus, the same context that supported a RFRA damages remedy also supported the application of qualified-immunity doctrine, which limits individual liability to violations of clearly established law.

18

Indeed, as the Court emphasized, the specific origin of RFRA makes even more compelling the inference that the damages remedy under that statute was meant to copy that under § 1983. RFRA was a response to the Supreme Court's decision in *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872, 885–90 (1990), "which held that the First Amendment tolerates neutral, generally applicable laws that burden or prohibit religious acts even when the laws are unsupported by a narrowly tailored, compelling governmental interest." *Tanzin*, 141 S. Ct. at 489. "RFRA made clear that it was reinstating both the pre-*Smith* substantive protections of the First Amendment *and* the right to vindicate those protections by a claim." *Id.* at 492. Also, continued the Court, "[t]here is no doubt that damages claims have always been available under § 1983 for clearly established violations of the First Amendment." *Id.* To be sure, *Tanzin* referenced this context only to support recognition of the damages claim under RFRA; although the parties before the Court agreed that there would be a qualified-immunity defense to a RFRA damages claim, *see id.* n.*, the Court did not expressly endorse that agreement. But the force of the Court's analysis remains. When it is so clear that RFRA was intended to reinstate what had been a pre-*Smith* damages action under § 1983, there is a strong implication that as venerable and important a component of § 1983 as qualified immunity was also incorporated. *Tanzin* observed that "[g]iven the textual cues [upon which it relied], it would be odd to construe RFRA in a manner that prevents courts from awarding [damages] relief." *Id.* at 492; *see id.* ("Had Congress wished to limit the remedy to that degree, it knew how to do so."). For the same reasons, we think it

19

would be equally odd to construe RFRA to preclude a qualified-immunity defense. In short, we think our prior decision in *Werner*, 49 F.3d at 1481–82, got it right in applying qualified immunity to RFRA damages claims, even though our decision concerned a since-invalidated RFRA claim against state actors, *see City of Boerne v. Flores*, 521 U.S. 507, 511 (1997) (holding that RFRA is unconstitutional in so far as it permits suits against state actors).

We are unpersuaded by Mr. Ajaj's two counterarguments. First, he contends that *Tanzin* discouraged "judicial policymaking," which this court would be engaged in by attaching a defense to RFRA when Congress had not done so itself. Aplt. Supp. Br. at 12. But Mr. Ajaj misconceives the point that the Court was making. Once it had applied the tools of statutory interpretation to construe RFRA as providing a damages remedy against individual officers, the Court refused to adopt policy arguments made by the government against such a remedy. To be sure, when trying to construe the vague term *appropriate relief* in RFRA, the Court looked to "background presumptions" (such as the liability of individual government officials for damages) that were themselves based on policy considerations. *Tanzin*, 141 S. Ct. at 493. But for background presumptions to "inform the understanding of a word or phrase [in a statute], those presumptions must exist at the time of enactment." *Id.* What the government was advocating was policy that had not been incorporated in earlier relevant statutes, and the Court refused to "manufacture a new presumption now and retroactively impose it on a Congress that acted 27 years ago." *Id.* In contrast, to recognize qualified immunity in damages cases under RFRA is not to

20

create new policy but to construe statutory language in light of a background presumption that was well-established when RFRA was enacted.

Second, Mr. Ajaj argues that Congress indicated its intent not to include a qualified-immunity defense (or any other unstated defenses) when it included a specific defense in the statute's text, 42 U.S.C. § 2000bb–1(b). *See United States v. Brown*, 529 F.3d 1260, 1265 (10th Cir. 2008) ("Under the doctrine of *expressio unius est exclusio alterius*, to express or include one thing implies the exclusion of the other." (internal quotation marks omitted)). We have a different view.

The relevant provisions of 42 U.S.C. § 2000bb–1 state:

(a) In general—Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b).

(b) Exception—Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—

(1) is in furtherance of a compelling governmental interest; and

(2) is the least restrictive means of furthering that compelling governmental interest.

The exception stated in subsection (b) to the general rule stated in subsection (a) is not confined to suits for damages. If the government action is the least restrictive means of serving a compelling governmental interest, there is no violation of law. This proposition was accepted both before and after the Supreme Court's decision in *Smith*. *See, e.g.*, *Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 718 (1981) ("The mere fact that the petitioner's religious practice is burdened by a governmental program does not mean that an exemption accommodating his practice must be

21

granted. The state may justify an inroad on religious liberty by showing that it is the least restrictive means of achieving some compelling state interest."); *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1881 (2021) ("A government policy can survive strict scrutiny only if it advances interests of the highest order and is narrowly tailored to achieve those interests. Put another way, so long as the government can achieve its interests in a manner that does not burden religion, it must do so." (citation and internal quotation marks omitted)). Such justification of an infringement of free exercise not only precludes a damages award but would also preclude any equitable relief.

In other words, subsection (b) is not just a means of protecting individuals from inappropriate damages awards. The policies that must be considered in deciding whether to recognize qualified immunity are not at play. We can think of no reason to infer from that provision that Congress was expressing any disapproval of the tradition of granting qualified immunity to public officials. "The [*expressio unius*] doctrine properly applies only when the *unius* (or technically, *unum*, the thing specified) can reasonably be thought to be an expression of *all* that shares in the grant or prohibition involved." A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 107 (2012); *see Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003) (The *expressio unius* canon "does not apply to every statutory listing or grouping; it has force only when the items expressed are members of an associated group or series, justifying the inference that items not mentioned were excluded by deliberate choice, not inadvertence." (internal quotation marks omitted)). For example, if a

22

restaurant sign says "No dogs allowed," does that mean that pet monkeys and baby elephants are welcome? *See Reading Law* at 107. Here, it is reasonable to infer that subsection (b) states the only justification for substantially burdening someone's exercise of religion. But it is not reasonable to view the subsection as stating the only ground on which an official can defend against personal liability for such an imposition. What if the official acted under a court order or because a gun was held to the official's head? In our view, Mr. Ajaj would have us stretch a useful canon of construction beyond its limits.

We conclude that qualified immunity can be invoked by officials sued for damages in their individual capacities under RFRA. We reverse the district court's dismissal of Mr. Ajaj's individual-capacity claims and remand for the court to determine whether the relevant defendants are entitled to immunity.

### III.    CONCLUSION

We **REVERSE** the district court's order dismissing Mr. Ajaj's group-prayer claim as moot and its order dismissing all individual-capacity suits for monetary relief and **REMAND** for further proceedings consistent with this opinion. We **DENY** as moot Plaintiff-Appellant's Motion to Supplement Record on Appeal.

23