**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

**May 6, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

_____

CALVARY ALBUQUERQUE INC.;
STEFAN DAVID GRANT GREEN;
KEILAH ANNA GREEN; H.P.G., a minor,

     Plaintiffs - Appellants,

v.

MARCO RUBIO, U.S. Secretary of State;
U.S. DEPARTMENT OF STATE,* an
Agency of the United States; OFFICE OF
THE LEGAL ADVISER FOR
CONSULAR AFFAIRS; U.S.
CONSULATE JOHANNESBURG; U.S.
CONSULATE CAPE TOWN;
UNKNOWN CONSULAR OFFICER,

     Defendants - Appellees.

No. 24-2066

_____

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. 1:23-CV-00486-KWR-KK)**

_____

Olsi Vrapi (Julia Jagow with him on the briefs), Vrapi Weeks, P.A., Albuquerque,
New Mexico, appearing for Appellants.

---

* On January 21, 2025, Marco Rubio became U.S. Secretary of State. Pursuant
to Fed. R. App. P. 43(c)(2), he has been substituted for Antony Blinken as a
Defendant - Appellee in this action. On March 13, 2024, Antony Blinken, former
U. S. Secretary of State, was dismissed from the lawsuit by the U.S. District Court
for the District of New Mexico, Dist. Ct. Doc. at 23.

Aaron S. Goldsmith, Senior Litigation Counsel (Brian M. Boynton, Assistant Attorney General; William C. Peachey, Director; Glenn M. Girdharry, Assistant Director, with him on the brief), United States Department of Justice, Immigration Litigation, Washington, DC, appearing for Appellees.

_____

Before **MATHESON**, **BACHARACH**, and **FEDERICO**, Circuit Judges.

_____

**MATHESON**, Circuit Judge.

_____

Stefan Green, a South African citizen, sought a visa to come to the United States to serve as the worship leader at Calvary Albuquerque, Inc. ("Calvary"), a non-profit church in Albuquerque, New Mexico. A consular officer denied Mr. Green's R-1 visa application. Calvary sued to challenge the visa denial, alleging the consular officer violated the Religious Freedom Restoration Act ("RFRA"). Applying the consular nonreviewability doctrine, the district court dismissed Calvary's suit and denied preliminary injunctive relief. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I. **BACKGROUND**

### A. *Legal Background*

To aid in understanding Mr. Green's visa denial, the complaint's allegations, and the district court proceedings, we provide a brief overview of the applicable law.

1. **Consular Nonreviewability Doctrine**

The consular nonreviewability doctrine states that "as a rule, the federal courts cannot review [consular officers' visa] decisions." *Dep't of State v. Muñoz*, 602 U.S. 899, 908 (2024); *see Kerr v. Polis*, 20 F.4th 686, 729 (10th Cir. 2021) (Briscoe, J., concurring); *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 543 (1950) ("[I]t is not within the province of any court, unless expressly authorized by law, to review the determination of the political branch of the Government to exclude a given [noncitizen].").

The doctrine has two exceptions. First, under the "expressly authorize" exception, Congress may "expressly authorize[]" judicial review of consular officers' visa decisions. *Muñoz*, 602 U.S. at 908; *Knauff*, 338 U.S. at 543. Second, under the "constitutional claim" exception, the Supreme Court has "assumed that a narrow exception to [consular nonreviewability] exists 'when the denial of a visa allegedly burdens the constitutional rights of a U.S. citizen,'" constraining review to whether the consular officer "gave a facially legitimate and bona fide reason for denying the visa." *Muñoz*, 602 U.S. at 908 (quoting *Trump v. Hawaii*, 585 U.S. 667, 703 (2018)). Some circuits also have conducted a more searching review of the consular officer's visa decision if a plaintiff "affirmatively allege[s] facts 'with sufficient particularity' to raise a 'plausibl[e]' inference that the consular officer acted in 'bad faith.'" *Khachatryan v. Blinken*, 4 F.4th 841, 852 (9th Cir. 2021) (quoting *Kerry v. Din*,

3

576 U.S. 86, 105 (2015) (Kennedy, J., concurring)); *Sesay v. United States*, 984 F.3d 312, 316-17 (4th Cir. 2021).

2. **Religious Freedom Restoration Act**

RFRA, enacted in 1993, provides that the "[g]overnment shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability," unless it "is in furtherance of a compelling governmental interest" and "is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(a), (b). "Government" includes "a branch, department, agency, instrumentality, and official (or other person acting under color of law) of the United States." *Id.* § 2000bb-2(1). RFRA "applies to all Federal law, and the implementation of that law, whether statutory or otherwise, and whether adopted before or after" RFRA's enactment. *Id.* § 2000bb-3(a). It provides that "[a] person whose religious exercise has been burdened in violation of [RFRA] may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government." *Id.* § 2000bb-1(c).

RFRA's purposes were "to restore the compelling interest test as set forth in *Sherbert v. Verner*, 374 U.S. 398 (1963) and *Wisconsin v. Yoder*, 406 U.S. 205 (1972) . . . to guarantee its application in all cases when free exercise of religion is substantially burdened," and "to provide a claim or defense to persons whose religious exercise is substantially burdened by government." *Id.* § 2000bb(b).

3. **Immigration and Nationality Act and Foreign Affairs Manual**

Under Section 212 of the Immigration and Nationality Act ("INA"), a consular officer may determine that a noncitizen is inadmissible to the United States based on misrepresentation. 8 U.S.C. § 1182(a)(6)(C)(i) ("Any alien who, by fraud or willfully misrepresenting a material fact, seeks to procure (or has sought to procure or has procured) a visa, other documentation, or admission into the United States . . . is inadmissible.").

The State Department's Foreign Affairs Manual ("FAM") is "a single, comprehensive, and authoritative source for the Department's organization structures, policies, and procedures that govern the operations of the State Department." U.S. Dep't of State, Foreign Affairs Manual, https://perma.cc/T8JU-PZVJ. The FAM states that a consular officer "may presume that the [visa] applicant made a willful misrepresentation" if the applicant "engages in conduct inconsistent with [his] nonimmigrant status within 90 days of visa application or admission to the United States," including "[e]ngaging in unauthorized employment on B1/B2 nonimmigrant status." 9 FAM § 302.9-4(B)(3)(g)(2). This is called the "90-day rule."

The FAM also provides that "[r]eligious leaders and members of religious denominations or groups . . . may be issued B-1 visas" if they are "entering the United States temporarily for the sole purpose of performing missionary work on behalf of a denomination . . . if the member will receive no salary or remuneration

5

from U.S. sources other than an allowance or other reimbursement for expenses incidental to the temporary stay." *Id.* § 402.2-5(C)(1)(a). But "[m]issionary work" should not "be used as a substitute for ordinary labor for hire." *Id.*

B. ***Factual Allegations***[1]

On April 9, 2022, Mr. Green entered the United States with a B-1/B-2 visa as a "nonimmigrant visitor for business . . . or pleasure," "not includ[ing] local employment or labor for hire." 22 C.F.R. § 41.31(a), (b); 8 U.S.C. § 1101(a)(15)(B). During this visit, he led worship services at Calvary. The purpose of his visit was to "determine if Albuquerque would ultimately be a good fit for Mr. Green and his family." App. at 69.[2]

On April 25, 2022, Calvary petitioned the U.S. Citizenship and Immigration Services ("USCIS") for an R-1 visa so Mr. Green could join Calvary's staff as Worship Director. For four months while the petition was pending, Calvary gave Mr. Green "honoraria/allowances as thank you gifts for leading worship on Sundays at the church." *Id.* at 70. Calvary has a "sincerely held religious belief that

---

[1] This factual history derives from the allegations in Calvary's complaint and the attached exhibit—an advisory opinion from the State Department's Office of the Legal Adviser for Consular Affairs about Mr. Green's visa denial. *See Commonwealth Prop. Advocs., LLC v. Mortg. Elec. Registration Sys., Inc.*, 680 F.3d 1194, 1201 (10th Cir. 2011) (noting that we "accept[] as true all well-pleaded factual allegations in the complaint" on an appeal from a motion to dismiss and "may consider not only the complaint, but also the attached exhibits").

[2] Mr. Green travelled with his wife and child on this visit, but their visa denials are not at issue.

6

ministers," including "guest worship leaders," "should and must be compensated" as a "central tenet of their faith." *Id.*

On August 29, 2022, the USCIS approved Calvary's R-1 petition. But "an approved R-1 petition does not guarantee that the applicant will obtain a visa." *Id.* at 11 n.2; *see id.* at 69-72. After the petition is approved, "a consular officer independently determines that an applicant can receive a R-1 immigrant visa to enter the United States." *Id.* at 11 n.2.

Sometime between August and November 2022, Mr. Green returned to South Africa. In November 2022, a consular officer in Cape Town, South Africa denied Mr. Green's first visa application under INA section 214(b) "for a presumption of immigrant intent by not sufficiently demonstrating strong ties to the home country that will compel the visa applicant to leave at the end of his temporary stay in the USA." *Id.* at 70-71. This first visa denial is not at issue in this appeal.

Mr. Green refiled his visa application and scheduled an interview at the consular office in Johannesburg, South Africa in December 2022. Mr. Green "provided a packet of information from his attorney that detailed his ties to the home country and explained the honoraria/allowances that Mr. Green received" before USCIS granted Calvary's R-1 petition. *Id.* at 71. The consular officer at that interview "asked if he had received a salary in the United States." *Id.* After the interview, Mr. Green submitted his pay records from Calvary to the consular office.

He had a follow up interview in January 2023.  "At this third interview, the question of honoraria came up again as the central issue."  *Id.*

In January 2023, the consular officer denied Mr. Green's R-1 visa application. Calvary alleges the visa denial was based solely on INA section 212(a)(6)(C)(i)— misrepresentation.

Mr. Green sought an advisory opinion from the State Department's Office of the Legal Adviser for Consular Affairs to explain the consular officer's visa denial. The advisory opinion stated that the consular officer denied Mr. Green's R-1 visa under (1) INA section 212(a)(6)(C)(i) for misrepresentation and (2) INA section 214(b) because Mr. Green was "unable to establish to the satisfaction of the consular officer that he would depart the United States upon the expiration or termination of R status."  *Id.* at 79-80; *see id.* at 72-73.

The advisory opinion explained that "based on the totality of information available, including statements made by [Mr. Green], the consular officer determined that [Mr. Green] misrepresented his purpose of travel to immigration officials at a port of entry on April 9, 2022, when he entered the United States using a B-1/B-2 visa."  *Id.* at 79.  Mr. Green "misrepresented his purpose of travel as one commensurate with a B-1/B-2 visa when in fact, he intended to engage in unauthorized employment for hire while in the United States, as an independent contractor, which is not permissible on a B-2 visa."  *Id.*  The advisory opinion also stated that "[w]hether or not [Mr. Green] made a material misrepresentation is a

8

factual determination that only a consular officer can decide, and in this case, did decide." *Id.*

## C. *District Court Proceedings*

### 1. Claims

Calvary's complaint alleged claims under RFRA, the Administrative Procedure Act ("APA"), and the Declaratory Judgment Act ("DJA"). First, Calvary claimed that the denial of Mr. Green's R-1 visa violated RFRA. The complaint alleged that the consular officer denied Mr. Green's visa because Calvary compensated him and this denial "substantially burden[ed]" Calvary's exercise of its "sincerely held religious belief that ministers should and must be compensated." *Id.* at 58. Second, Calvary claimed that Defendants' "denial of [Mr. Green's] visa is arbitrary, capricious, and exceeds Defendants' statutory authority," in violation of the APA. *Id.* at 75. Third, Calvary sought a declaratory judgment that Defendants' "action is against the law and violates RFRA." *Id.* at 74.

### 2. District Court Order

The Defendants moved to dismiss under Federal Rules of Civil Procedure 12(b)(1) for lack of Article III standing and 12(b)(6) for failure to state a claim.

The district court partially granted the Rule 12(b)(1) motion. It held that Calvary had standing to sue the unknown consular officer and dismissed all other plaintiffs and defendants.[3]

The district court granted the motion to dismiss for failure to state a claim. It held that RFRA did not authorize judicial review of the consular officer's visa denial, *id.* at 27, reasoning that RFRA "do[es] not extend to long-standing judicial presumptions and standards of review like the doctrine of consular nonreviewability," *id.* at 48. The court said the doctrine prevented it from "reviewing the consular officer's decision under RFRA, the APA, and the DJA." *Id.* at 47.

The district court also reviewed the visa denial under the constitutional claim exception. It said, "[T]he Tenth Circuit analogizes RFRA claims to constitutional claims." *Id.* at 28. After making this threshold determination, the court held that the "consular officer's visa denial was made for [] facially legitimate and bona fide reasons." *Id.* The consular officer "cited a valid statutory reason for [visa] denial,"

---

[3] The district court dismissed Plaintiffs Mr. Green and his wife and child for lack of standing because the visa denial did "not invade any legally protected right they possessed under RFRA," and they therefore did not have an injury-in-fact. App. at 42. The court dismissed Defendants Antony Blinken (the Secretary of State), the State Department, the Office of the Legal Adviser for Consular Affairs, and the U.S. Consulates in Cape Town and Johannesburg because Calvary had "not demonstrated that these Defendants caused the visa denial or could redress the injury." *Id.* On appeal, Calvary does not challenge the standing ruling or dismissal of these plaintiffs and defendants, leaving only the unknown consular officer as a defendant.

8 U.S.C. § 1182(a)(6)(C)(i), and "provided plausible factual circumstances under which Mr. Green made his material misrepresentation to a border officer." *Id.* at 30.

The district court said that, absent bad faith, this was the full extent of judicial review permitted under the constitutional claim exception. "Any further intrusion into the consular officer's factual determination would transform this narrow exception to the doctrine of consular nonreviewability into a full judicial review of the case." *Id.* at 31. And because Calvary did not plausibly allege that the consular officer acted in bad faith, the district court could not "look[] behind the consular officer's decision for additional factual details." *Id.* at 48; *see id.* at 31-33, 49.[4]

"Even if the doctrine of consular nonreviewability did not prohibit the Plaintiffs' RFRA . . . claim[]," the district court also held that Calvary "ha[d] not stated a *prima facie* RFRA claim upon which relief can be granted." *Id.* at 51.

The district court denied Calvary's motion for a temporary restraining order and/or preliminary injunction. Calvary timely appealed only the RFRA claim.

## II. DISCUSSION

In the following discussion, we provide additional legal background on the consular nonreviewability doctrine and its exceptions. We then address whether the

---

[4] The district court also held the consular nonreviewability doctrine precluded relief under the APA and "decline[d] to exercise its discretion to determine parties' legal rights under the DJA." App. at 50-51. Calvary does not appeal the APA and DJA rulings.

expressly authorize exception applies to Calvary's RFRA claim and conclude it does not—RFRA does not expressly authorize judicial review of a consular officer's visa decision. And even assuming the constitutional claim exception applies, we conclude that the consular officer gave a facially legitimate and bona fide reason to deny Mr. Green's visa application, and that Calvary has not plausibly alleged the officer acted in bad faith.

We thus affirm the district court's dismissal of the complaint. Whether Calvary plausibly stated a RFRA claim and whether the district court erred in denying a preliminary injunction are therefore moot issues and we do not address them. *See Stein v. New Mexico*, 684 F. App'x 720, 721 n.1 (10th Cir. 2017) (unpublished); *Craft v. Null*, 543 F. App'x 778, 781 (10th Cir. 2013) (unpublished).[5]

## A. *Additional Legal Background*

We review de novo a district court's dismissal for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). *SEC v. Shields*, 744 F.3d 633, 640 (10th Cir. 2014); *see, e.g.*, *Khachatryan*, 4 F.4th at 849 (reviewing de novo the district court's application of consular nonreviewability doctrine on a motion to dismiss).

---

[5] We cite unpublished cases as persuasive under Fed. R. App. P. 32.1(A) and 10th Cir. R. 32.1.

12

The following elaborates on the consular nonreviewability doctrine and its exceptions for express authorization of judicial review and constitutional claims.  It also discusses principles of statutory interpretation we will use to address whether the expressly authorize exception applies.

1. **Consular nonreviewability**

The consular nonreviewability doctrine provides that "as a rule, the federal courts cannot review [consular officers' visa] decisions."  *Muñoz*, 602 U.S. at 908; *see Knauff*, 338 U.S. at 543.[6]  "For more than a century," the Supreme Court "has recognized that the admission and exclusion of foreign nationals is a 'fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control.'"  *Muñoz*, 602 U.S. at 908 (quoting *Trump*, 585 U.S. at 702); *see Knauff*, 338 U.S. at 542.  "The exclusion of [noncitizens] is a fundamental act of sovereignty," and the "right to do so stems not alone from legislative power but is inherent in the executive power to control the foreign affairs of the nation."  *Knauff*, 338 U.S. at 542.  The consular nonreviewability doctrine is

---

[6] *See also Hazama v. Tillerson*, 851 F.3d 706, 708 (7th Cir. 2017) (explaining the "general norm of nonreviewability" of consular officers' visa decisions); *Baaghil v. Miller*, 1 F.4th 427, 432 (6th Cir. 2021) (characterizing consular nonreviewability as a "no-trespass rule" generally precluding judicial review); *see also Saavedra Bruno v. Albright*, 197 F.3d 1153, 1162 (D.C. Cir. 1999) (describing that the "presumption of review" of agency action "runs aground" for "matters touching on national security or foreign affairs—and visa determinations are such matters" (quotations omitted)).

13

"judicial in origin" and "surely informed by our respect for the separation of powers." *Allen v. Milas*, 896 F.3d 1094, 1101 (9th Cir. 2018).

"Congress may delegate to executive officials the discretionary authority to admit noncitizens immune from judicial inquiry or interference." *Muñoz*, 602 U.S. at 907 (quotations omitted); *see Lem Moon Sing v. United States*, 158 U.S. 538, 547 (1895). If Congress "intrust[s] the final determination" of admission of a noncitizen "to an executive officer," "no other tribunal, unless expressly authorized by law to do so, [is] at liberty to re-examine the evidence on which he acted, or to controvert its sufficiency." *Fong Yue Ting v. United States*, 149 U.S. 698, 713 (1893); *see Nishimura Ekiu v. United States*, 142 U.S. 651, 660 (1892) ("It is not within the province of the judiciary to order that foreigners . . . shall be permitted to enter . . . ."). "The action of the executive officer under such authority is final and conclusive." *Knauff*, 338 U.S. at 543.

Through the INA, Congress channeled to consular officers this longstanding authority to admit noncitizens. *See* 8 U.S.C. §§ 1104, 1201. The INA "[did] not authorize judicial review of a consular officer's denial of a visa" when it delegated this authority. *Muñoz*, 602 U.S. at 907; *Saavedra Bruno v. Albright*, 197 F.3d 1153, 1160 (D.C. Cir. 1999) (describing how immigration laws since at least the 1920s have not authorized judicial review of consular officers' visa decisions (citing *United States ex rel. Ulrich v. Kellogg*, 30 F.2d 984, 986 (D.C. Cir. 1929))).

14

The consular nonreviewability doctrine so pervasively prevents judicial review of consular officers' visa decisions that, "[u]nderstandably," courts have "sometimes treated [it] as though it were a constraint on our subject matter jurisdiction because it appears to function in the same way as such constraints," and "the result is roughly the same for the parties." *Allen*, 896 F.3d at 1101. Even so, the Supreme Court has concluded that consular nonreviewability doctrine "is not jurisdictional." *Muñoz*, 602 U.S. at 908 n.4 (citing *Trump*, 585 U.S. at 681-82); *see Allen*, 896 F.3d at 1101.

### a. *Exceptions*

#### i. Expressly authorize

Congress may create an exception to consular nonreviewability by "expressly authoriz[ing]" judicial review of consular officers' visa decisions. *Muñoz*, 602 U.S. at 908 (quotations omitted). There must be a "clear directive from Congress" to overcome the reviewability bar. *Sesay*, 984 F.3d at 316. Courts have repeatedly recognized this exception without elaborating on what a statute must say to expressly authorize judicial review of consular officers' visa decisions. *See Muñoz*, 602 U.S. at 908; *Knauff*, 338 U.S. at 543; *Fong Yue Ting*, 149 U.S. at 713; *see also Trump*, 585 U.S. at 682.

#### ii. Constitutional claim

The Supreme Court has recognized a limited exception to consular nonreviewability for claims that a visa denial burdens a U.S. citizen's constitutional rights. *Muñoz*, 602 U.S. at 908; *Kleindienst v. Mandel*, 408 U.S. 753, 770 (1972).

15

Courts have not extended this exception to burdens on statutory rights. *See Qadar v. Mayorkas*, No. 18 Civ. 6817, 2021 WL 1143851, at *8 (S.D.N.Y. Mar. 24, 2021) ("Plaintiff's challenges to the visa denials under the APA and RFRA fall outside the exception to consular non-reviewability for constitutional claims, and thus are non-cognizable.").

## 1)  Facially legitimate and bona fide

Even when the constitutional claim exception applies, judicial review is "circumscribed." *Trump*, 585 U.S. at 703.  When a consular officer denies a visa "on the basis of a facially legitimate and bona fide reason, the courts will neither look behind the exercise of that discretion, nor test it by balancing its justification against the [constitutional] interests." *Mandel*, 408 U.S. at 770; *Yafai v. Pompeo*, 912 F.3d 1018, 1021 (7th Cir. 2019); *Allen*, 896 F.3d at 1097.

We have applied the "facially legitimate and bona fide" standard in immigration parole decisions. *Marczak v. Greene*, 971 F.2d 510, 517 (10th Cir. 1992).[7]  In that context, we have "require[d] the district director to have articulated . . . *some* factual basis for that decision [to deny parole] in each individual case," meaning that the "district director's decision must be at least reasonably supported by

---

[7] Immigration parole is a discretionary decision to permit a noncitizen to enter or remain temporarily in the United States "for urgent humanitarian reasons or significant public benefit" without a grant of admission to the country. *See* 8 U.S.C. § 1182(d)(5)(A).

16

the record." *Id.* at 517-18. But in the case at hand, less may be required. "[T]he decision to grant parole rests almost entirely in the hands of the district director," and there are no discrete factual predicates specified by statute for the parole decision. *Id.* at 518. Here, we review a consular officer's visa denial based on 8 U.S.C. § 1182(a)(6)(C)(i), a statute that "specifies discrete factual predicates" for inadmissibility. *Del Valle v. Sec'y of State*, 16 F.4th 832, 842 (11th Cir. 2021) (quotations omitted).

Our sister circuits have held that citing a valid statutory ground for a noncitizen's inadmissibility "constitutes a facially legitimate and bona fide reason," for visa denial when the statutory provision "specifies discrete factual predicates." *Id.* at 841-42.[8] In that circumstance, "the consular officer need not disclose the underlying facts that led him to conclude that the statute was satisfied." *Yafai*, 912 F.3d at 1021.

---

[8] *See also Baaghil*, 1 F.4th at 432; *Cardenas v. United States*, 826 F.3d 1164, 1172 (9th Cir. 2016); *Yafai*, 912 F.3d at 1021; *Colindres v. Dep't of State*, 71 F.4th 1018, 1024 (D.C. Cir. 2023), *cert. denied*, 144 S. Ct. 2716 (2024); *Sesay*, 984 F.3d at 316; *see also Din*, 576 U.S. at 105 (Kennedy, J., concurring) (reasoning that the "[g]overnment's citation of [a statute of inadmissibility]" alone "indicates it relied upon a bona fide factual basis for denying a visa"); *Trump*, 585 U.S. at 703 ("[T]he [g]overnment need provide only a statutory citation to explain a visa denial." (citing *Din*, 576 U.S. at 106 (Kennedy, J., concurring))).

17

2) Bad faith

Under the constitutional claim exception, some circuits have looked beyond the facially legitimate and bona fide reason if the plaintiff "affirmatively allege[s] facts 'with sufficient particularity' to raise a 'plausibl[e]' inference that the consular officer acted in 'bad faith.'" *Khachatryan*, 4 F.4th at 852 (quoting *Din*, 576 U.S. at 105 (Kennedy, J., concurring)); *Cardenas v. United States*, 826 F.3d 1164, 1172 (9th Cir. 2016); *Sesay*, 984 F.3d at 316-17 (applying bad faith exception).[9] *But see Yafai*, 912 F.3d at 1022 ("It is unclear how much latitude—if any—courts have to look behind a decision that is facially legitimate and bona fide to determine whether

_____

[9] In *Din*, a three-Justice plurality said that Mrs. Din's husband's visa denial did not implicate her liberty interests and therefore did not violate her rights under the Due Process Clause. 576 U.S. 86, 101 (2015) (plurality opinion). Justice Kennedy, joined by Justice Alito, separately concurred: "rather than deciding, as the plurality does, whether [Mrs.] Din has a protected liberty interest, my view is that, even assuming she does, the notice she received regarding her husband's visa denial satisfied due process." *Id.* at 102 (Kennedy, J., concurring). In his concurrence, Justice Kennedy recognized the "bad faith" inquiry. *Id.* at 105 (Kennedy, J., concurring).

Other circuits, applying *Marks v. United States*, 430 U.S. 188 (1977), have accepted Justice Kennedy's *Din* concurrence as controlling. *See Cardenas*, 826 F.3d at 1167; *Sesay*, 984 F.3d at 315 n.2. *Marks* reasoned "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." 430 U.S. at 193 (quotations omitted).

Here, we do not need to decide whether Justice Kennedy's *Din* concurrence is controlling because, even if it were, Calvary would not benefit from it because it has not plausibly alleged bad faith.

18

it was actually made in bad faith."); *Pak v. Biden*, 91 F.4th 896, 902 (7th Cir. 2024) (same).

To establish bad faith "at the pleading stage," a plaintiff must "affirmatively allege facts with sufficient particularity to raise a plausibl[e] inference that the consular officer acted in bad faith." *Khachatryan*, 4 F.4th at 852 (quotations omitted). A plaintiff may allege (1) the "consular official did not in good faith *believe* the information he [or she] had" or (2) the "Consulate acted upon information it *knew* to be false." *Id.* (quotations omitted); *Bustamante v. Mukasey*, 531 F.3d 1059, 1062-63 (9th Cir. 2008). The "objective unreasonableness of a stated reason for a visa denial," especially at the pleading stage, "remains a factor to consider in assessing whether the plaintiff has pleaded facts with sufficient particularity to give rise to a plausible inference of subjective bad faith." *Khachatryan*, 4 F.4th at 853.

b. *Statutory interpretation principles*

Our central task in this case is to interpret RFRA's statutory text and how it interacts with the consular nonreviewability doctrine, in particular the expressly authorize exception. "Our first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997). "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Id.* at 341. A statute is ambiguous if it is reasonably

19

"susceptible to more than one interpretation," *Wright v. Fed. Bureau of Prisons*, 451 F.3d 1231, 1235 (10th Cir. 2006), or "capable of being understood by reasonably well-informed persons in two or more different senses," *United States v. Quarrell*, 310 F.3d 664, 669 (10th Cir. 2002) (quotations omitted).

"If the statute's text is unambiguous, then its plain meaning controls, and our inquiry ends." *United States v. Broadway*, 1 F.4th 1206, 1211 (10th Cir. 2021). But if the statutory language "is ambiguous, we must turn to other sources to find its meaning." *S. Utah Wilderness All. v. Off. of Surface Mining Reclamation & Enf't*, 620 F.3d 1227, 1237-38 (10th Cir. 2010). "If an ambiguity is found, a court may seek guidance from Congress's intent, a task aided by reviewing the legislative history," and "resolve ambiguities by looking at the purpose behind the statute." *Quarrell*, 310 F.3d at 669 (quotations omitted); *see Reves v. Ernst & Young*, 494 U.S. 56, 73 (1990) ("Given this ambiguity, the [provision] must be interpreted in accordance with its purpose."). Also, "we look to traditional canons of statutory construction to inform our interpretation." *Ramah Navajo Chapter v. Salazar*, 644 F.3d 1054, 1062 (10th Cir. 2011) (quotations omitted).

## B. *Analysis*

As explained above, "expressly authorize" and "constitutional claim" are exceptions to the consular nonreviewability doctrine. Neither rescues Calvary's RFRA claim.

20

First, RFRA's cause-of-action provision plainly does not expressly authorize judicial review of consular officers' visa decisions. Also, whether the provision stating RFRA applies to "all Federal law" expressly authorizes judicial review of consular officers' visa decisions is ambiguous. Applying statutory construction tools to that clause, we conclude that RFRA does not do so.

Second, even if Calvary's RFRA claim were eligible for the constitutional claim exception, the exception would not ultimately apply because the consular officer provided a facially legitimate and bona fide reason for the visa denial and Calvary has not plausibly alleged an affirmative showing of bad faith.

1. **Expressly authorize exception**

As explained below, RFRA's text does not plainly and unambiguously expressly authorize judicial review of consular officers' visa decisions, so we look for guidance to RFRA's history and purpose, canons of statutory construction, and relevant case law. Comparing what "expressly authorize" requires with our statutory analysis, we conclude that RFRA does not expressly authorize judicial review of consular officers' visa decisions.

a. *Expressly authorize*

We must construe not only the relevant provisions of RFRA but also what "expressly authorize" means. We employ "dictionary and thesaurus support" to understand this phrase. *Long v. Bd. of Governors of the Fed. Rsrv. Sys.*, 117 F.3d 1145, 1157 (10th Cir. 1997); *see Conrad v. Phone Directories Co.*, 585 F.3d 1376,

21

1381 (10th Cir. 2009) ("We may consult a dictionary to determine the plain meaning of a term."); *Miller v. United States*, 71 F.4th 1247, 1253 (10th Cir. 2023) (consulting a thesaurus), *cert. granted*, 144 S. Ct. 2678 (2024).[10]

The word "expressly" means "[i]n explicit or direct terms; clearly, plainly, unmistakably."  *Expressly*, Oxford English Dictionary, https://perma.cc/S5CX-6JJ8; *see Express*, Black's Law Dictionary (12th ed. 2024) (defining "express" as "[c]learly and unmistakably communicated; stated with directness and clarity"). "[E]xpressly" is synonymous with "specifically" and "explicitly."  *Roget's 21st Century Thesaurus* 331 (Barbara Ann Kipfer ed., 1992); *see* William C. Burton, *Burton's Legal Thesaurus* 232 (4th ed. 2007) (identifying "specific" and "explicit" as synonyms of "express").

The word "authorize" means "[t]o give legal authority; to empower." *Authorize*, Black's Law Dictionary (12th ed. 2024); *see Roget's 21st Century Thesaurus* 49 (Barbara Ann Kipfer ed., 1992) (listing "give authority" as a synonym for "authorize"); William C. Burton, *Burton's Legal Thesaurus* 49 (4th ed. 2007) (same).

---

[10] "Expressly authorize" is the Supreme Court's common law standard to determine whether Congress has created an exception to consular nonreviewability. We seek dictionary guidance for this phrase's meaning, as the Court has done to define or understand common law terms.  *See Giles v. California*, 554 U.S. 353, 359-60 (2008).

Bringing these definitions together, we understand the "expressly authorize" exception to the consular nonreviewability doctrine to require legislation that clearly, unmistakably, and specifically gives courts the legal authority to review consular officers' visa decisions. *See also* Power Thesaurus, https://perma.cc/N53V-YCPQ (listing "specifically empowers" and "unquestionably enables" as synonymous with "expressly authorizes").

This understanding aligns with courts saying that under "[t]he doctrine of consular nonreviewability" "[t]he Supreme Court has unambiguously instructed" that the expressly authorize exception requires a "clear directive from Congress," *Sesay*, 984 F.3d at 316, and that noncitizens residing abroad are "barred from challenging consular visa decisions in federal court unless legislation *specifically permitted* such actions." *Saavedra Bruno*, 197 F.3d at 1162 (emphasis added).

We would normally expect the express authorization to appear in statutory text. But even if a statute's purpose alone may provide a "clear directive from Congress," *Sesay*, 984 F.3d at 316, neither RFRA's text nor its legislative purpose satisfies the expressly authorize exception.[11]

---

[11] In *Mitchum v. Foster*, 407 U.S. 225 (1972), the Supreme Court held that 42 U.S.C. § 1983 expressly authorized injunctive relief as an exception to the anti-injunction statute. *Mitchum*'s holding stemmed from analysis of the unique historical context of § 1983 and the anti-injunction statute rather than specific language in § 1983. *See infra* note 16.

b. *RFRA Text*

We next look to whether RFRA's text expressly authorizes judicial review of consular officers' visa decisions. We address whether the relevant RFRA provisions are plain or ambiguous when considered alongside the "expressly authorize" requirement.

i. Cause-of-action provision

RFRA provides that "[a] person whose religious exercise has been burdened" by the government "may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government." 42 U.S.C. § 2000bb-1(c). "Government" includes "a branch, department, agency, instrumentality, and official (or other person acting under color of law) of the United States." *Id.* § 2000bb-2(1). These provisions say nothing about the consular nonreviewability doctrine and lack any "clear directive from Congress" for judicial review of consular officers' visa decisions. *Sesay*, 984 F.3d at 316. They plainly and unambiguously do not expressly authorize judicial review of consular officers' visa decisions, and this "plain meaning controls." *Broadway*, 1 F.4th at 1211.

Calvary nonetheless argues that "[h]ad Congress wished for RFRA to not apply to consular decisions, it could have done so, but did not," and that "Congress could have exempted U.S. Consulates and consular officers from the definition of 'government,' but it did not." Aplt. Br. at 10-11, 15. But this argument misunderstands the expressly authorize exception and turns it on its head—Congress

24

must unmistakably authorize that consular officers' visa decisions are subject to judicial review. These provisions do not do so.

Under Calvary's view, any federal statute that authorizes a cause of action against the government would abrogate the consular nonreviewability doctrine. Adopting this view would render superfluous the "expressly" part of "expressly authorize" and would "fl[y] in the face of more than a century of decisions limiting our review of consular visa decisions." *See Allen*, 896 F.3d at 1107 (explaining if the APA's creation of a cause of action against the government displaced consular nonreviewability it would "convert[] consular nonreviewability into consular reviewability").

ii. "All Federal law" provision

RFRA also states that it "applies to all Federal law, and the implementation of that law, whether statutory or otherwise, and whether adopted before or after November 16, 1993." 42 U.S.C. § 2000bb-3(a). This language sweeps broadly, prompting some courts to say that it effectively amended all federal laws. *See, e.g.*, *In re Hodge*, 220 B.R. 386, 398 (D. Idaho 1998); *see also, e.g.*, *Rweyemamu v. Cote*, 520 F.3d 198, 202 (2d Cir. 2008) (stating "RFRA is unusual in that it amends the entire United States Code"), *abrogated on other grounds by Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171 (2012); *Worldwide Church of God v. Phila. Church of God, Inc.*, 227 F.3d 1110, 1120 (9th Cir. 2000).

25

Despite its sweep, the "all Federal law" clause does not plainly and unambiguously apply to the consular nonreviewability doctrine on two grounds.

First, when combined with the expressly authorize requirement, "all Federal law" does not clearly or unambiguously apply to the consular nonreviewability doctrine. Although federal laws generally may fall under this RFRA provision, we must also examine the interplay between the expressly authorize requirement and RFRA's "all Federal law" provision, in particular whether "expressly authorize" requires more clarity and specificity than the words "all Federal law." We think it does, and RFRA therefore lacks the "clear directive" necessary to jettison the consular nonreviewability doctrine. *Sesay*, 984 F.3d at 316.

This analysis is comparable to cases applying a clear statement rule to statutory language. "[A] clear statement rule . . . implies a special substantive limit on the application of an otherwise unambiguous [statutory] mandate." *Spector v. Norwegian Cruise Line Ltd.*, 545 U.S. 119, 141 (2005) (plurality opinion). Further,

> Implied limitation rules avoid applications of otherwise unambiguous statutes that would intrude on sensitive domains in a way that Congress is unlikely to have intended had it considered the matter. In these instances, the absence of a clear congressional statement is, in effect, equivalent to a statutory qualification saying, for example, "Notwithstanding any general language of this statute, this statute shall not apply . . . ." These clear statement rules ensure Congress does not, by broad or general language, legislate on a sensitive topic inadvertently or without due deliberation.

*Id.* at 139. "[S]tate sovereign immunity" is one such sensitive topic. *See Sossamon v. Texas*, 563 U.S. 277, 291 (2011). In *Sossamon*, a prisoner sued the State of Texas under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), a counterpart to RFRA. The Court asked whether Congress "ha[d] specifically considered . . . and ha[d] intentionally legislated on the matter," *id.* at 290-91, and concluded that RLUIPA did not "expressly and unequivocally" waive the state's sovereign immunity, *id.* at 290.

As discussed below, we do not think RFRA's "all Federal law" clause is clear and unambiguous, but even if it were, it is not the "clear directive," *Sesay*, 984 F.3d at 316, that the term "expressly authorize" requires for the sensitive topic of consular nonreviewability.[12]

---

[12] In *Bond v. United States*, 572 U.S. 844, 857 (2014), the Supreme Court considered how a clear statement rule interacts with an otherwise plain-on-its-face statute:

> Part of a fair reading of statutory text is recognizing that Congress legislates against the backdrop of certain unexpressed presumptions . . . . To take another example, we presume, absent a clear statement from Congress, that federal statutes do not apply outside the United States. So even though [18 U.S.C. § 229], read on its face, would cover a chemical weapons crime if committed by a U.S. citizen in Australia, we would not apply the statute to such conduct absent a plain statement from Congress.

*Id.* (citing *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 255 (2010)) (quotations omitted).

Also, in *United States v. Bass*, 404 U.S. 336, 350 (1971), the government urged a "broad construction" of a federal statute that prevented any convicted felon from "receiv[ing], possess[ing], or transport[ing] in commerce or affecting commerce

27

Second, "all Federal law . . . statutory or otherwise" does not clearly encompass longstanding judicially-created doctrines like consular nonreviewability. For example, as discussed in more depth below, we have said that RFRA does not displace the judicially-created doctrine of qualified immunity. *Ajaj v. Fed. Bureau of Prisons*, 25 F.4th 805, 813 (10th Cir. 2022). As broad as the "all Federal law" clause may be, it may or may not include doctrines like abstention, forum non conveniens, stare decisis, remittitur, and preclusion. *See* Amy Coney Barrett, *Procedural Common Law*, 94 Va. L. Rev. 813, 822-32 (2008) (identifying areas of federal "procedural common law"). In addition to qualified immunity, federal courts have applied against RFRA claims the judicially-created doctrines of prosecutorial immunity, *Bundy v. Sessions*, 812 F. App'x 1, 3 (D.C. Cir. 2020) (per curiam) (unpublished), judicial immunity, *Prall v. Wolfson*, No. Civ. 11-5696, 2011 WL 5240778, at *4 (D.N.J. Oct. 31, 2011), sovereign immunity from money damages, *Davila v. Gladden*, 777 F.3d 1198, 1209-10 (11th Cir. 2015) (collecting cases), and laches, *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 239 F. Supp. 3d 77, 88 (D.D.C. 2017).

---

*. . . any firearm*" to encompass even firearms without an interstate commerce nexus. *Id.* at 337, 350 (emphasis added) (quoting 18 U.S.C. App. § 1202(a) (repealed 1986)). Despite the words "any firearm," the Court held this statute did not apply to firearms without an interstate commerce nexus because it lacked a clear statement from Congress showing intent to disrupt the federal-state balance. *Id.* at 349-50.

Reading "all Federal law" against the "backdrop of existing law," *Parker Drilling Mgmt. Servs., Ltd. v. Newton*, 587 U.S. 601, 611 (2019) (quoting *McQuiggin v. Perkins*, 569 U.S. 383, 398 n.3 (2013)), we cannot say this statutory text unambiguously displaces longstanding judicial doctrines like consular nonreviewability.  This point aligns with the principle that "background presumptions can inform the understanding of a word or phrase" in a statute, so long as "those presumptions . . . exist at the time of enactment." *Tanzin v. Tanvir*, 592 U.S. 43, 52 (2020); *see also McFarland v. Scott*, 512 U.S. 849, 856 (1994) (relying on the "legal backdrop" against which "Congress legislated" to clarify what Congress enacted).  And the consular nonreviewability doctrine is more than a presumption—it bars judicial review of visa decisions and was well-established when Congress passed RFRA.  *See Knauff*, 338 U.S. at 543; *Mandel*, 408 U.S. at 769; *Ulrich*, 30 F.2d at 986; *United States ex rel. London v. Phelps*, 22 F.2d 288, 290 (2d Cir. 1927).

In sum, RFRA's cause-of-action provision does not plainly override the consular nonreviewability doctrine.  And because it is ambiguous whether "all Federal law . . . statutory or otherwise," 42 U.S.C. § 2000bb-3(a), expressly authorizes judicial review of consular officers' visa decisions, we must "turn to other sources to find its meaning," *S. Utah Wilderness All.*, 620 F.3d at 1237-38; *see Quarrell*, 310 F.3d at 669.  RFRA's history and purpose, the common law canon of statutory construction, and our case law show that "all Federal law" does not expressly authorize judicial review of consular officers' visa decisions.

29

c. *RFRA history and purpose*

Applying the consular nonreviewability doctrine comports with RFRA's history and purpose. *See McCreary County v. ACLU*, 545 U.S. 844, 861 (2005) ("Examination of purpose is a staple of statutory interpretation that makes up the daily fare of every appellate court in the country . . . ."); *United States v. Blake*, 59 F.3d 138, 140 (10th Cir. 1995).

RFRA, enacted in 1993, responded to *Employment Division v. Smith*, 494 U.S. 872 (1990), in which the Supreme Court held that burdens on religious exercise are constitutional under the Free Exercise Clause if they result from a neutral law of general application having a rational basis. *Id.* at 878-80; *United States v. Hardman*, 297 F.3d 1116, 1126 (10th Cir. 2002) (en banc). The pre-*Smith* standard, as stated in *Sherbert v. Verner*, 374 U.S. 398 (1963), and *Wisconsin v. Yoder*, 406 U.S. 205 (1972), permitted a substantial burden on an individual's religious exercise only if the government could show the law furthered a compelling state interest in the least restrictive way. *See Smith*, 494 U.S. at 882-84; *Sherbert*, 374 U.S. at 407 ("[I]t would plainly be incumbent upon the [government] to demonstrate that no alternative forms of regulation would combat such abuses without infringing First Amendment rights."); *see also Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 747-51 (2014) (Ginsburg, J., dissenting).

30

Congress specified in RFRA's statement of purpose that it was enacted to restore the pre-*Smith* compelling interest test.[13]  *See* 42 U.S.C. §§ 2000bb(b), 2000bb-1(b); S. Rep. No. 103-111, at 2, 7-8 (1993) ("To assure that all Americans are free to follow their faiths free from governmental interference, the committee finds that legislation is needed to restore the compelling interest test" from before *Smith*.); *see also* 138 Cong. Rec. 18018 (1992) (statement of Sen. Mark Hatfield) (explaining that Congress enacted RFRA to "restore the state of the law to the standard used before the Smith decision").[14]

When Congress restored the pre-*Smith* compelling interest standard in RFRA, it did not express any intent to alter other aspects of Free Exercise jurisprudence.  *See* 42 U.S.C. § 2000bb(b)(1).  In *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114 (10th Cir. 2013) (en banc), *aff'd sub nom. Hobby Lobby*, 573 U.S. 682, we said, "Congress, through RFRA, intended to bring Free Exercise jurisprudence back to the test established before *Smith*.  There is no indication Congress meant to alter any

---

[13] "Statutory provisions setting forth Congress's purposes should be given great weight in understanding the legislative purpose(s)."  William N. Eskridge Jr., *Interpreting Law:  A Primer on How to Read Statutes and the Constitution* 412 (2016); *see POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 106-07 (2014); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law:  The Interpretation of Legal Texts* 217-18 (2012).

[14] *See T-Mobile South LLC v. City of Roswell*, 574 U.S. 293, 301 (2015) (discussing relevance of committee reports to understand congressional purpose and the statutory scheme); *see* William N. Eskridge Jr., *Interpreting Law:  A Primer on How to Read Statutes and the Constitution* 240-45 (2016) (describing committee reports as some of the more reliable legislative history).

31

other aspect of pre-*Smith* jurisprudence . . . ." *Id*. at 1133. Notably, the pre-*Smith*
free exercise compelling interest test applied to all federal laws, and pre-*Smith* First
Amendment claims were subject to the consular nonreviewability doctrine. *See*
*Mandel*, 408 U.S. at 769-70 (applying consular nonreviewability to First Amendment
claim).

Before RFRA, the consular nonreviewability doctrine applied to First
Amendment claims. *See, e.g.*, *id.* Courts would review visa decisions under the
constitutional claim exception to the doctrine and determine whether there was a
"facially legitimate and bona fide" reason for visa denial. *Muñoz*, 602 U.S. at 908;
*Mandel*, 408 U.S. at 770.[15] If RFRA's purpose was to replicate pre-*Smith* free
exercise law via statute, RFRA claims also are subject to the consular
nonreviewability doctrine.[16]

---

[15] Calvary argues that applying consular nonreviewability doctrine here means
"RFRA's application is not 'guaranteed' in 'all cases'"—which is part of RFRA's
purpose statement. Aplt. Br. at 15, 18 (quoting 42 U.S.C. § 2000bb(b)(1)). But the
reference to "all cases" is not a clear directive for judicial review of consular
officers' visa decisions. These decisions were presumptively unreviewable when
Congress passed RFRA, unless an exception to consular nonreviewability applied.
*See Knauff*, 338 U.S. at 543; *Mandel*, 408 U.S. at 770.

[16] Calvary relies on *Mitchum v. Foster*, 407 U.S. 225 (1972)—cited for the first
time in its reply brief. In *Mitchum*, the plaintiff sued under 42 U.S.C. § 1983, alleging
constitutional violations against state judicial and law enforcement officials. The issue
was whether § 1983 permitted the district court to stay state court proceedings when the
anti-injunction statute prohibited this relief "except as expressly authorized by Act of
Congress." 28 U.S.C. § 2283.

d. *Common law canon of construction*

"If a statute is ambiguous, we look to traditional canons of statutory construction to inform our interpretation." *Ramah Navajo Chapter*, 644 F.3d at 1062 (quotations omitted).

---

The Supreme Court said, "The test . . . is whether an Act of Congress, clearly creating a federal right or remedy enforceable in a federal court of equity, could be given its intended scope only by the stay of a state court proceeding." *Mitchum*, 407 U.S. at 238. The Court said § 1983 met this test, explaining that Congress enacted it in 1871 to enforce Fourteenth Amendment protections against state action, *id.* at 238-39, because "it was concerned that state instrumentalities could not protect those rights," *id.* at 242. Congress did so as part of "a vast transformation from the concepts of federalism that had prevailed in the late 18th century." *Id.*

The Court further explained, "The very purpose of § 1983 was to interpose the federal courts between the States and the people, as guardians of the people's federal rights" which could be achieved only by "authoriz[ing] the federal courts to issue injunctions" against state court proceedings "in § 1983 actions." *Id.* Thus, § 1983 "authorized the federal courts to issue injunctions in § 1983 actions, by expressly authorizing a 'suit in equity' as one of the means of redress." *Id.*

Congress enacted RFRA against a different historical backdrop. It did not "clearly creat[e] a federal right or remedy enforceable in a federal court of equity" that "could be given its intended scope only by" authorizing judicial review of consular officers' visa decisions. *Id.* at 238. Congress aimed "to restore the compelling interest test" for free exercise claims that the Supreme Court struck down in *Smith*. 42 U.S.C. § 2000bb(b)(1). Because the consular nonreviewability doctrine applied to First Amendment claims before *Smith*, *see, e.g.*, *Mandel*, 408 U.S. at 770, applying it here comports with RFRA's purpose.

*Mitchum* interpreted how § 1983's unique history applied to the "expressly authorized" language in the anti-injunction statute. To the extent *Mitchum* suggests legislative history and purpose may be one means to supply a "clear directive from Congress" to "expressly authorize" an exception to the consular nonreviewability doctrine, *Sesay*, 984 F.3d at 316, it supports affirmance of the district court's decision because, as explained above, RFRA's legislative history and purpose does not do so.

33

Under the common law canon, "[s]tatutes which invade the common law . . . are to be read with a presumption favoring the retention of long-established and familiar principles, except when a statutory purpose to the contrary is evident." *Kirtsaeng v. John Wiley & Sons, Inc.*, 568 U.S. 519, 538 (2013) (quoting *Isbrandtsen Co. v. Johnson*, 343 U.S. 779, 783 (1952)); *see* William N. Eskridge Jr., *Interpreting Law: A Primer on How to Read Statutes and the Constitution* 348 (2016) ("[C]ourts will assume that legislatures act against the background of the common law and that relevant common law doctrines will be incorporated into the statute, to the extent consistent with the statutory purpose."); Antonin Scalia & Bryan A. Garner, *Reading Law: the Interpretation of Legal Texts* 318 (2012).

Under this canon, we read RFRA's "all Federal law" clause with "a presumption favoring the retention of long-established and familiar principles" in common law, like consular nonreviewability doctrine. *Kirtsaeng*, 568 U.S. at 538 (quotations omitted). RFRA contains no "evident" "statutory purpose" that would overcome this presumption. *Id.* (quotations omitted).

      e. *Case law*

In *Ajaj*, we held that RFRA does not displace another longstanding, judicially-created doctrine—qualified immunity. 25 F.4th at 813. In doing so, "[w]e [could] think of no reason to infer from [RFRA's text] that Congress was expressing any disapproval of the tradition of granting qualified immunity to public officials." *Id.* at 816. We said, "When it is so clear that RFRA was intended to reinstate what had

34

been a pre-*Smith* damages action under § 1983, there is a strong implication that as venerable and important a component of § 1983 as qualified immunity was also incorporated." *Id.* at 815. "[T]o recognize qualified immunity in damages cases under RFRA is not to create new policy but to construe statutory language in light of a background presumption that was well-established when RFRA was enacted." *Id.* at 815-16.[17]

When Congress passed RFRA, both qualified immunity and consular nonreviewability were well-established and "venerable" judicially-created doctrines. *Id.* at 815. As in *Ajaj*, we see "no reason to infer" from RFRA's text "that Congress was expressing any disapproval of the tradition" that consular officers' visa decisions are not subject to judicial review. *Id.* at 817. Applying consular nonreviewability doctrine here does not "create new policy but . . . construe[s] statutory language in light of a background presumption that was well-established when RFRA was enacted." *Id.* at 815-16.[18] Calvary cannot square its position with *Ajaj*.

---

[17] S*ee also Hobby Lobby*, 723 F.3d at 1161-62 (Bacharach, J., concurring) (describing that Congress did not "expressly abrogate[]" judicially-created "prudential-standing limitations in RFRA," in part because "Congress never mentioned prudential restrictions" in the statute).

[18] Calvary argues that consular nonreviewability is distinguishable because it has "a built-in exception for review that is 'expressly authorized by law'" and "[t]he district court completely missed this exception of the doctrine." Aplt. Br. at 17-18 (quoting *Muñoz*, 602 U.S. at 908). But the ability of Congress to displace consular nonreviewability by statute does not distinguish it from other judicially-created doctrines—Congress also could remove qualified immunity by statute.

The case for the consular nonreviewability doctrine's applicability to RFRA claims is at least as strong as it is for qualified immunity.[19]  The doctrine stems from a "fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control."  *Trump*, 585 U.S. at 702 (quotations omitted).  As part of the "inherent . . . executive power to control the foreign affairs," *Knauff*, 338 U.S. at 542, the doctrine finds constitutional backing from the separation of powers, *Allen*, 896 F.3d at 1101.  "As to these areas of Art. II duties the courts have traditionally shown the utmost deference to Presidential responsibilities."  *United States v. Nixon*, 418 U.S. 683, 710 (1974).  In upholding the Secretary of State's authority to revoke passports, the Supreme Court said, "the generally accepted view [is] that foreign policy was the province and responsibility of the Executive."  *Haig v. Agee*, 453 U.S. 280, 293-94 (1981); *see also Dep't of Navy v. Egan*, 484 U.S. 518, 530 (1988) ("[U]nless Congress specifically has provided otherwise, courts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs.").

*    *    *    *

---

[19] The Supreme Court has explained that qualified immunity "is an *immunity from suit* rather than a mere defense to liability," *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985), so it bears more resemblance to consular nonreviewability than its name implies.

In sum, RFRA does not expressly authorize judicial review of consular officers' visa decisions or otherwise displace the consular nonreviewability doctrine.

### 2. Constitutional claim exception

Calvary argues the constitutional claim exception to the consular nonreviewability doctrine applies because it brought a free exercise claim under RFRA, and RFRA is analogous to a constitutional right. Aplt. Br. at 27-28. The government counters that Calvary has not alleged a constitutional claim because RFRA is a statute. Aplee. Br. at 32-33. We need not decide this issue. Even if a RFRA claim could qualify for the exception, Calvary has not plausibly alleged that (a) the consular officer failed to provide a facially legitimate and bona fide reason to deny Mr. Green's visa application or (b) the officer acted in bad faith.

#### a. *Facially legitimate and bona fide reason*

Under the constitutional claim exception, we review only whether the consular officer provided a "facially legitimate and bona fide reason" for denying Mr. Green's visa. *Mandel*, 408 U.S. at 770. The consular officer here cited 8 U.S.C. § 1182(a)(6)(C)(i) as a reason for denying Mr. Green's visa, which has discrete factual predicates for visa denial—"fraud or willful[] misrepresent[ation] [of] a material fact." *See Del Valle*, 16 F.4th at 842 (quoting 8 U.S.C. § 1182(a)(6)(C)(i)) (recognizing this statute as one that "specifies discrete factual predicates"). According to our sister circuits, this statutory citation alone is a facially legitimate and bona fide reason for visa denial. *Id.* at 841-42; *Baaghil v. Miller*, 1 F.4th 427,

37

432 (6th Cir. 2021); *Cardenas*, 826 F.3d at 1172; *Yafai*, 912 F.3d at 1021; *Sesay*, 984

F.3d at 316; *Colindres v. Dep't of State*, 71 F.4th 1018, 1024 (D.C. Cir. 2023), *cert.*

*denied*, 144 S. Ct. 2716 (2024); *see Din*, 576 U.S. at 104-05 (Kennedy, J.,

concurring); *Trump*, 585 U.S. at 703.[20]

But we do not need to decide if this statutory citation alone is enough because

the consular officer's decision here was also "at least reasonably supported by the

record." *Marczak*, 971 F.2d at 517.  Mr. Green presented evidence to the consular

officer that reasonably supported applying 8 U.S.C. § 1182(a)(6)(C)(i).  Specifically,

Mr. Green stated to the consular officer "that he had received honoraria before

approval of the R-1 petition," App. at 71, and he submitted documentation of

Calvary's payments to him.  This evidence would reasonably support a consular

officer's finding that Calvary's payments were "salary or remuneration" or that

Mr. Green's missionary work was a "substitute for ordinary labor for hire."  9 FAM

§ 402.2-5(C)(1)(a)(3).  This "conduct inconsistent with . . . nonimmigrant status

---

[20] The amended complaint alleged that the consular officer denied Mr. Green's R-1 visa based only on misrepresentation under INA section 212(a)(6)(C)(i).  The advisory opinion from the Office of the Legal Adviser for Consular Affairs said the officer also denied the visa under INA section 214(b) because Mr. Green was "unable to establish to the satisfaction of the consular officer that he would depart the United States upon the expiration or termination of R status."  App. at 79-80.  Because we determine that the officer provided a facially legitimate and bona fide reason for the first ground and Calvary has not plausibly alleged bad faith, we need not concern ourselves with the second ground or this difference between the amended complaint and the advisory opinion.

within 90 days of [his] visa application or admission to the United States" permits a

consular officer to "presume that [Mr. Green] made a willful misrepresentation," *id.*

§ 302.9-4(B)(3)(g)(2)(a), making Mr. Green ineligible for admission under 8 U.S.C.

§ 1182(a)(6)(C)(i).

The advisory opinion from Office of the Legal Adviser for Consular Affairs

also provides "*some* factual basis for th[e] decision" in Mr. Green's "individual

case." *Marczak*, 971 F.2d at 518. It states that "based on the totality of information

available, including statements made by [Mr. Green], the consular officer determined

that [Mr. Green] misrepresented his purpose of travel to immigration officials at a

port of entry on April 9, 2022, when he entered the United States using a B-1/B-2

visa." App. at 79.[21] The consular officer determined that Mr. Green "intended to

engage in unauthorized employment for hire while in the United States, as an

independent contractor, which is not permissible on a B-2 visa." *Id.* This

---

[21] Calvary argues that the "unknown consular officer provided zero factual basis to Mr. Green regarding his visa denial" because the "only communication he received from the Unknown Consular Officer was a sheet of paper that noted that he was denied under 8 U.S.C.§ 1182(a)(6)(C)(i)" and "[n]o further reasoning or facts supporting the decision were given to Mr. Green by the consular officer." Aplt. Br. at 29. But the advisory opinion that Calvary attached to its complaint identifies factual bases for the consular officer's decision to deny Mr. Green's visa. Calvary's complaint does not allege that the consular officer had no factual bases or that the advisory opinion incorrectly characterizes the consular officer's factual bases. And Calvary cites no legal authority stating that a consular officer must communicate the factual bases for the visa denial to the applicant during the interview. We therefore properly consider the information provided in the advisory opinion attached to the complaint on this point.

individualized determination in Mr. Green's case clearly meets the facially legitimate and bona fide standard. *See Marczak*, 971 F.2d at 517-18.

b. *Bad faith*

We do not need to decide if we have the authority to analyze the consular officer's decision for bad faith, because "[w]hatever residual authority courts have to review visa decisions on [bad faith] ground[s], the circumstances presented here do not trigger it." *Pak*, 91 F.4th at 902. In its complaint, Calvary "failed to make an affirmative showing that the officer denied [the] visa in bad faith." *Yafai*, 912 F.3d at 1022 (quotations omitted). We thus will not look behind the consular officer's facially legitimate and bona fide reason for denying Mr. Green's visa to conduct a more searching review. *See Khachatryan*, 4 F.4th at 852, 855.

First, Calvary has not plausibly alleged that the consular officer "did not in good faith *believe* the information he . . . had." *Id.* at 852. Calvary's complaint alleged that the consular officer "failed to consider evidence presented" by Mr. Green, App. at 72, but it does not identify what evidence the officer failed to consider. Calvary alleged that, when the officer denied Mr. Green's visa in the interview, "Mr. Green immediately asked the consular officer if he was being denied because of the honoraria/allowances that he previously received, but the officer refused to answer his question and just shut the window." *Id.* at 71. But this allegation does not say the officer did not believe the information he had and does

40

not "raise a plausibl[e] inference that the consular officer acted in bad faith." *Khachatryan*, 4 F.4th at 852 (quotations omitted).

Second, Calvary has not plausibly alleged that the consular officer "acted upon information it *knew* to be false." *Id.* (quotations omitted). Calvary's complaint does not identify any such information. To the contrary, Calvary alleged that Mr. Green was "questioned about receiving a salary or any dollars from Calvary Church" in visa interviews and "answered honestly that he had received honoraria before approval of the R-1 petition." App. at 71. Mr. Green also submitted pay records from Calvary to the consulate. Calvary alleged that the consular officer "failed to consider evidence presented," but that allegation does not claim the officer knowingly relied on false information. *Id.* at 72. Calvary further alleged that "no reasonable facts supported the visa denial," *id.*, but "attempts to establish bad faith" must involve "more than conclusory allegations" like this one, *Sesay*, 984 F.3d at 316.

Third, Calvary has not plausibly alleged that the consular officer was "objectively unreasonable" in the "stated reason for visa denial." *Khachatryan*, 4 F.4th at 853. Calvary alleged that "[t]he consular officer exhibited an egregious disregard for the law because no reasonable facts supported the visa denial" and the "consular officer acted in bad faith when he refused to follow the FAM mandates on applying the 90-day rule" because Mr. Green's "actions were permissible under the FAM." App. at 72; *see* Aplt. Br. at 39.

41

But the consular officer's reasons for denying the visa were not objectively unreasonable. The FAM states that members of religious groups on B-1 visas may receive an "allowance or other reimbursement for expenses incidental to the temporary stay," but they cannot receive "salary or remuneration" and "[m]issionary work" should not "be used as a substitute for ordinary labor for hire." 9 FAM § 402.2-5(C)(1)(a)(3). Based on Mr. Green's statements about his compensation and accompanying documentation, a reasonable consular officer could determine that Mr. Green performed "ordinary labor for hire," *id.*, or otherwise "[e]ngag[ed] in unauthorized employment on B1/B2 nonimmigrant status," and therefore "presume that [Mr. Green] made a willful misrepresentation" under the 90-day rule, *id.* § 302.9-4(B)(3)(g)(2). And here, the consular officer did determine that Mr. Green "intended to engage in unauthorized employment for hire while in the United States, as an independent contractor, which [was] not permissible." App. at 79. The consular officer's decision was not objectively unreasonable based on the information Mr. Green provided, and Calvary has not shown otherwise.

"Making an affirmative showing of bad faith requires a plaintiff to point to something more than an unfavorable decision." *Yafai*, 912 F.3d at 1022 (quotations omitted). Here, Calvary points to an unfavorable decision and disagrees with the consular officer's determination that "Mr. Green had engaged in unauthorized employment when on his B1/B2 visa." App. at 72. This is not sufficient to make an

42

"affirmative showing of bad faith" by the consular officer. *Khachatryan*, 4 F.4th at 852 (quotations omitted).

## III. **CONCLUSION**

For the foregoing reasons, we affirm dismissal of this action based on the consular nonreviewability doctrine and affirm the district court's judgment.

*Calvary Albuquerque Inc., et al. v Rubio, U.S. Secretary of State, et al.*
No. 24-2066
**BACHARACH**, J., dissenting.

In this appeal, the Court must determine whether a consular official's visa decision is subject to judicial review. Such a decision is generally unreviewable under federal law. But an exception exists when judicial review is *expressly authorized by law*. That authorization exists in the Religious Freedom Restoration Act.

Because this statute expressly authorizes judicial review, we must decide whether a church pleaded a prima facie claim under the statute. This statute restricts the imposition of a substantial burden on the exercise of a sincerely held religious belief. Invoking this statute, a church alleges that its minister (a noncitizen) couldn't return to resume religious work because he had been paid during an earlier visit. These allegations satisfy the church's prima facie burden at the pleading stage.

But the majority declines to consider that burden, concluding that the Religious Freedom Restoration Act doesn't expressly authorize review of the church's claim. I respectfully disagree.

1.     **The government denies a visa to a minister working in New Mexico.**

This litigation stems from a minister's two trips to the United States from South Africa.

In the first trip, the minister obtained a tourist visa (B-1/B-2) and visited Calvary's church in New Mexico. While there, he led services. Calvary then obtained a change in the minister's status, and this change allowed him to work full-time. With his new status, the minister began working at Calvary's church.

After a few months, the minister visited South Africa. As the visit came to an end, the minister requested an R-1 visa so that he could return to Calvary's church and continue working as a minister.[1] A U.S. consular officer denied the request, reasoning that prior payments to the minister had violated the conditions of his B-1/B-2 tourist visa. This decision led Calvary to sue the government under the Religious Freedom Restoration Act, claiming a substantial burden on the exercise of religion.

**2.    The district court dismisses Calvary's claim.**

The government moved for dismissal and the district court granted the motion and dismissed this claim, concluding that

- the consular official's decision was not reviewable and

- Calvary hadn't pleaded a substantial burden on a sincerely held religious belief.

---

[1]    To return to the United States on an R-1 visa, the minister needed a visa stamp on his passport.

2

**3.     We independently consider these conclusions.**

Our review is de novo. *See Matney v. Barrick Gold of N. Am.*, 80 F.4th 1136, 1144 (10th Cir. 2023). So we must independently consider whether Calvary has pleaded factual allegations that would "state a [plausible] claim to relief." *Id.* For this inquiry, we view the allegations in the complaint in the light most favorable to Calvary. *Mayfield v. Bethards*, 826 F.3d 1252, 1255 (10th Cir. 2016).

**4.     The Religious Freedom Restoration Act expressly authorizes review of the consular officer's decision.**

The Act expressly authorizes review, as reflected in the text and legislative history.

Consular decisions on visas are generally unreviewable. *Dep't of State v. Muñoz*, 602 U.S. 899, 906 (2024). But an exception exists when review is "expressly authorized by law." *Id.* at 908. So we must determine whether judicial review is *expressly authorized* in the Religious Freedom Restoration Act. This determination turns on the applicability of the Act to consular decisions and the existence of an express right of action when these decisions impinge on religious freedom.

**a.     The Act applies to all federal laws.**

The Act says that it applies to all federal law, "whether statutory or otherwise." 42 U.S.C. § 2000bb-3. In this way, the Act "operates as a kind

3

of super statute, displacing the normal operation of other federal laws

. . . .” *Bostock v. Clayton Cnty.*, 590 U.S. 644, 682 (2020).

Here the law being displaced exists under the common law rather than in a statute. But the Religious Freedom Restoration Act displaces federal laws existing at common law as well as in statutes. *See Crocker v. Austin*, 115 F.4th 660, 666 (5th Cir. 2024) (concluding that the Religious Freedom Restoration Act overrides a judge-made abstention doctrine); *see also* Scott D. Pollock, *Immigration Law vs. Religious Freedom: Using the Religious Freedom Restoration Act to Challenge Restrictive Immigration Laws & Practices*, 12 RUTGERS J. OF L. & RELIGION 295, 309–10 (2011) (stating that Congress's silence in the Religious Freedom Restoration Act as to immigration laws must have reflected recognition that immigration laws might inhibit religious exercise "when the federal government . . . refuses to permit persons residing abroad to gain access to the United States to engage in religious activity").

**b.    The Act doesn't apply in some circumstances, but those circumstances aren't present here.**

The government cites various opinions where courts have declined to apply the Religious Freedom Restoration Act. These opinions decline to apply the Act when the claimant

- fails to properly invoke the Act,

- has other statutory protections, or

4

- violates generally applicable rules of procedure.

In addition, the government relies on opinions applying generally applicable limits on personal liability. But our case doesn't involve a failure to properly invoke the Act, the possibility of other statutory protections, or generally applicable constraints on procedure or personal liability. Our issue is different: Does the Act *expressly authorize* judicial review?

First, the Act applies only when it's properly invoked. So we held in an unpublished opinion that the Act applies only when a claimant invokes a religious belief. *See Hale v. Fed. Bureau of Prisons*, 759 F. App'x 741, 746–49 (10th Cir. 2019) (unpublished). And other courts have enforced general limits on

- the timing of claims under the Act, *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 239 F. Supp. 3d 77, 84–88 (D.D.C. 2017) (laches) and

- the preservation of these claims, *United States v. Amer*, 110 F.3d 873, 879 n.1 (2d Cir. 1997) (forfeiture).

Here, however, the government doesn't contend that Calvary failed to properly invoke the Act.

Second, Congress explained that it wasn't intending to displace certain other statutory protections for religious exercise. An example is Title VII of the Civil Rights Act of 1964. *See* S. Rep. No. 103-111, at 13. The Third Circuit relied on this congressional intent, holding that the

5

Religious Freedom Restoration Act doesn't displace the protections afforded under Title VII. *Francis v. Mineta*, 505 F.3d 266, 270–72 (3d Cir. 2007). But the government doesn't suggest that Calvary has other statutory protections.

Third, courts have applied generally applicable rules on procedural issues, such as selection of a forum or relitigation of issues already decided. For example, a court may conclude that another district is more convenient for claims under the Religious Freedom Restoration Act. *E.g.*, *Hueter v. Kruse*, 610 F. Supp. 3d 60, 66–72 (D. D.C. 2022). Similarly, a court may apply collateral estoppel when the claim arises under the Act. *E.g.*, *Olsen v. Mukasey*, 541 F.3d 827, 830–31 (8th Cir. 2008). But we're not addressing a generally applicable rule of procedure.

In addition, courts have held that the Act doesn't displace limits on personal liability. *See Ajaj v. Fed. Bureau of Prisons*, 25 F.4th 805, 813–17 (10th Cir. 2022) (qualified immunity); *Bundy v. Sessions*, 812 F. App'x 1, 3 (D.C. Cir. 2020) (unpublished) (prosecutorial immunity); *Azzarmi v. Donnelly*, No. 21-12, 2021 WL 405491, at *2 (E.D.N.Y. 2021) (unpublished) (judicial immunity). But our issue doesn't involve limitations on personal liability.

The issue instead is whether the Act expressly authorizes judicial review. The Act unambiguously provides judicial review: "A person whose religious exercise has been burdened in violation of this section may assert

6

that violation as a claim . . . in a judicial proceeding and obtain appropriate relief against a government." 42 U.S.C. § 2000bb-1(c).

The majority points out that we should interpret this statutory language against the "backdrop of existing law." Maj. Op. at 29 (quoting *Parker v. Drilling Mgmt. Servs., Ltd. v. Newton*, 587 U.S. 601, 611 (2019)); *see Stewart v. Dutra Const. Co.*, 543 U.S. 481, 487 (2005). When considering that backdrop, we presume that Congress was aware of existing case law when adopting the Religious Freedom Restoration Act. *See Mack v. Yost*, 63 F.4th 211, 223 (3d Cir. 2023). That case law included Supreme Court opinions

- recognizing the availability of judicial review over consular decisions when "expressly authorized by law," *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953), and

- addressing what is required for a statute to *expressly authorize* judicial review, *Mitchum v. Foster*, 407 U.S. 225, 237–38 (1972).

The Supreme Court addressed the availability of judicial review in *Mitchum v. Foster*, 407 U.S. 225 (1972). There the plaintiff invoked a general civil rights law (42 U.S.C. § 1983) for an injunction against state-court proceedings. *Id.* at 226–27. But a federal law, the Anti-Injunction Act, generally prohibited courts from enjoining state-court proceedings. 28 U.S.C. § 2283; *see Mitchum*, 407 U.S. at 226. An exception existed when judicial review was "expressly authorized" under a statute. 28 U.S.C. § 2283; *see Mitchum*, 407 U.S. at 226. Applying this exception, the

7

*Mitchum* Court considered whether § 1983 *expressly authorized* an injunction against state courts despite the broad language in the Anti-Injunction Act. 407 U.S. at 226.

The problem for the claimant was that § 1983 didn't mention the Anti-Injunction Act. *Id.* The Supreme Court concluded that this omission didn't matter because the law could *expressly authorize* court action without referring to the Anti-Injunction Act: "[I]t is evident that, in order to qualify under the 'expressly authorized' exception of the anti-injunction statute, a federal law need not contain an express reference to that statute. As the Court has said, 'no prescribed formula is required; an authorization need not expressly refer to [the Anti-Injunction Act].'" *Id.* at 237 (quoting *Amalgamated Clothing Workers of Am. v. Richman Bros.*, 348 U.S. 511, 516 (1955)).

Given this legal backdrop, Congress presumably knew when it adopted the Religious Freedom Restoration Act that

- consular decisions were reviewable when *expressly authorized by law* and

- the Supreme Court had held that a general law (§ 1983) *expressly authorized* judicial review even though the law didn't even mention the statute that would otherwise have barred review.

So Congress presumably recognized that it could *expressly authorize* judicial review through a law comparable to § 1983.

8

Is the Religious Freedom Restoration Act comparable to § 1983 in authorizing judicial review? To answer, we must consider the attributes of § 1983 underlying the decision in *Mitchum*. There the Court regarded § 1983 as "a uniquely federal remedy against incursions under the claimed authority of state law upon rights secured by the Constitution and laws of the Nation." *Id.* at 239. For this broad conception of § 1983, the Court relied on the legislative history, which showed an intent to enforce the Fourteenth Amendment against state action in all three branches of government. *Id.* at 240–42.

The Religious Freedom Restoration Act bears a similar legislative history, reflecting Congress's "sweeping" purpose to ensure religious freedom in the application of every federal law unless expressly excluded. 1 William W. Bassett, et al., *Religious Organizations and the Law* § 3:13, at 310 (2d ed. 2023–24); *see also Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 693 (2014) ("Congress enacted [the Religious Freedom Restoration Act] in 1993 in order to provide very broad protection for religious liberty."). To ensure this sweeping effect, Congress applied the new statutory protections to "[a]ll governmental actions which have a substantial external impact on the practice of religion." H.R. Rep. No. 103-88, at 6. To extend these protections with enough breadth, Congress used expansive language from § 1983, *Tanzin v. Tanvir*, 592 U.S. 43, 48 (2020), protecting religious exercise "whenever a law or an action taken by the

9

government to implement a law burdens a person's exercise of religion,"
H.R. Rep. No. 103-88, at 6. Given Congress's broad design to authorize
appropriate relief against all governmental actors, the Religious Freedom
Restoration Act expressly authorizes judicial review in the same way that
§ 1983 did.

Though § 1983 also expressly authorized judicial review, the
available remedies may differ from those in the Religious Freedom
Restoration Act. This Act allows "appropriate relief," which could trigger
judge-made limits on personal liability, such as qualified immunity,
prosecutorial immunity, and judicial immunity. 42 U.S.C. § 2000bb-1(c);
*see* Maj. Op. at 28; *see also* p. 6, above.

The majority appears to conflate these limits on *appropriate relief*
with what's required to expressly authorize judicial review. Though the
government and the majority cite cases addressing limits on the remedies
constituting *appropriate relief*, none of these cases discuss the availability
of judicial review. *See* Maj. Op. at 28 (citing cases).

But that issue was expressly addressed in *Mitchum*, where the
Supreme Court treated the broad language in § 1983 as an express
authorization of judicial review. *See* pp. 7–8, above. The Religious
Freedom Restoration Act contains equally broad language, authorizing
appropriate relief against all governmental actors and extending the right
to sue governmental actors impinging on religious freedom when

10

administering *any* federal law. As a result, the Religious Freedom Restoration Act expressly authorizes judicial review, just as § 1983 did in *Mitchum v. Foster*.[2]

### c.    Judicial review doesn't undermine the separation of powers.

The majority contends that recognition of judicial review would undermine the separation of powers between the executive and judicial branches. But we're not asked to decide whether Calvary would prevail on the merits of a claim under the Religious Freedom Restoration Act. To the contrary, our only issue is whether courts can carry out Congress's command for judicial review when a person invokes a statute directed at governmental interference with religious rights. If the person pleads a prima facie case, the government could still defend the denial of a visa as the least restrictive means to further a compelling governmental interest. *See* Part 5, below.

---

[2]    The majority also argues that the Supreme Court has "unambiguously instructed" other courts that judicial review is expressly authorized by law only if there's a "clear directive from Congress." Maj. Op. at 23 (quoting *Sesay v. United States*, 984 F.3d 312, 316 (4th Cir. 2021)). For this argument, the majority relies on a Fourth Circuit opinion (*Sesay v. United States*) discussing the general rule restricting review of consular decisions. *Id.*; *see Sesay*, 984 F.3d at 316. In the cited passage, the Fourth Circuit referred to the Supreme Court's opinion in *Trump v. Hawaii*. *Id.* But in *Trump v. Hawaii*, the Supreme Court didn't discuss the term *expressly authorized by law* or say anything about the need for a clear directive from Congress. 585 U.S. 667, 703–04 (2018). So I do not think that we can rely on *Trump* or *Sesay* for meaningful guidance on the scope of the term *expressly authorized by law*.

11

* * *

In my view, the Religious Freedom Restoration Act expressly authorized judicial review over the administration of all federal laws, including those involving consular decisions on visas.

**5.   Calvary stated a valid claim under the Religious Freedom Restoration Act.**

Because the Religious Freedom Restoration Act allows judicial review of consular decisions, we must decide whether Calvary adequately pleaded a statutory violation. Under the Act, a plaintiff must plead a prima facie case consisting of a substantial governmental burden on a sincere exercise of religion. *Kikumura v. Hurley*, 242 F.3d 950, 960 (10th Cir. 2001), *abrogated in part on other grounds, as recognized in Free the Nipple-Ft. Collins v. City of Fort Collins*, 916 F.3d 792, 797 (10th Cir. 2019). If the plaintiff satisfies this burden, the government can defend its action as the least restrictive means to further a compelling governmental interest. 42 U.S.C. § 2000bb-1(b); *Kikumura*, 242 F.3d at 961–62.

The government argues that Calvary failed to adequately plead a prima facie case. For a *substantial burden* on a sincere religious exercise, Calvary had to allege governmental pressure "to significantly modify . . . religious behavior and significantly violate[] [Calvary's] religious beliefs." *U.S. Navy Seals 1-26 v. Biden*, 27 F.4th 336, 350 (5th Cir. 2022). The burden could be substantial even if it didn't "compel or order the claimant

12

to betray a sincerely held religious belief." *Yellowbear v. Lampert*, 741
F.3d 48, 55 (10th Cir. 2014). Rather, "[i]t [was] enough that the claimant
[was] presented with a choice in which [the claimant] face[d] considerable
pressure to abandon the religious exercise at issue." *Id.*

Calvary alleged both a sincere religious practice and burden on that
practice. For example, Calvary alleged that it

- had a religious practice of paying all ministers and

- was denied the minister of its choice.

Calvary also alleged pressure to

- abandon its religious practice of paying its minister and

- compromise in its selection of a minister.

The government responds that Calvary could get other people to serve as
ministers, but this response disregards the complaint and Calvary's
allegation that the ministry is a religious calling.

First, we confine ourselves to the complaint because the appeal
involves a dismissal for failure to state a valid claim. *Kamplain v. Curry
Cnty. Bd. of Comm'rs*, 159 F.3d 1248, 1250 (10th Cir. 1998); *see* p. 15,
below. In the complaint, Calvary didn't admit that it could have hired
someone else as the minister. To the contrary, Calvary alleged that it had
gone roughly five years without finding a suitable worship leader.

13

Calvary further alleged

- religious beliefs that ministry is a *calling* and that ministers should be paid[3] and

- interference with the exercise of religious beliefs in the need to pay the minister and select the person called by the divinity to lead the congregation.

These allegations reflect a substantial burden on religious exercise even if Calvary could have replaced its minister with someone else. *See Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171, 188 (2012) (concluding that the First Amendment's free exercise clause is violated when the government deprives a "church of control over the selection of those who will personify its beliefs").[4]

---

[3]     For this allegation, Calvary pointed to Biblical passages, including

- 1 *Corinthians* 9:14, which says: "In the same way, the Lord has commanded that those who preach the gospel should receive their living from the gospel" and

- *Galatians* 6:6, which says: "Nevertheless, the one who receives instruction in the word should share all good things with their instructor."

[4]     We need not address other potential burdens, such as a limitation on the pool of potential applicants. The Seventh Circuit recently held that such a restriction hadn't created a substantial burden on religious freedom. *Soc'y of the Divine Word v. U.S. Citizenship & Immigr. Servs.*, 129 F.4th 437, 450 (7th Cir. 2025). There, however, the religious organizations didn't

- "identify a belief or set of beliefs" affected by the restriction or

14

**6.    The district court didn't err in declining to rely on the State Department's additional reason for the consular decision.**

The government also argues that it based the denial of a visa on skepticism that the minister would leave the United States when his visa expired. The district court rejected this argument, but we can consider it if the record clearly shows that the consular official relied on this reason to deny the minister's visa. *See United States v. Schneider*, 594 F.3d 1219, 1227 (10th Cir. 2010) (stating that we can affirm on alternative grounds only when they're clear from the record).

When we consider the record, we're ordinarily limited to the allegations in the complaint when reviewing a dismissal for failure to state a valid claim. *See Klein v. Zavaras*, 80 F.3d 432, 434 (10th Cir. 1996); *see also* p. 13, above. In the complaint, Calvary did not allege that the consular official had given this reason when denying the visa. To the contrary, Calvary alleged that the consular official had denied the visa based solely on the minister's acceptance of unauthorized employment while in the country on a B-1/B-2 visa.

The government points out that the complaint included an attachment from the State Department, which expressed skepticism of the minister's

---

- allege an inability to retain a particular minister or an inability to compensate ministers in violation of a religious belief.

*Id.* at 250.

15

intent to leave as a reason to deny the visa. But we're limited to the consular official's reasons and can't consider later explanations by the State Department. *See Patel v. Reno*, 134 F.3d 929, 933 (9th Cir. 1997) ("Not even the Secretary of State has the power to review a consular official's visa decision."); *Bruno v. Albright*, 197 F.3d 1153, 1156–57 (D.C. Cir. 1999) (stating that the Secretary of State can't control a consular official's decision whether to grant a visa).

And in the complaint, Calvary alleged that the consular official had relied solely on the minister's unauthorized employment during his earlier visit. We must credit that allegation, which is inconsistent with the government's reliance on the State Department's later explanation for the denial. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1003 (9th Cir. 2018) (concluding that "it is improper to assume the truth of an incorporated document if such assumptions only serve to dispute facts stated in a well-pleaded complaint").

\* \* \*

I would thus reverse the district court's ruling and remand with instructions to deny the motion to dismiss.[5]

---

[5] The appeal involves more than the dismissal. Calvary moved for a preliminary injunction, and the district court denied this motion. Calvary appeals the denial of a preliminary injunction as well as the dismissal.

The majority concludes that with the dismissal, the appeal involving denial of the preliminary injunction became moot. Because I disagree with the dismissal, I would not rely on mootness when addressing the denial of a preliminary injunction. Maj. Op. at 12. Instead, I would address this ruling on the merits.

On the merits, the district court relied in part on Calvary's failure to show irreparable injury. This omission is fatal, and Calvary hasn't said why the district court was wrong in rejecting irreparable injury. *See Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1267 (10th Cir. 2005) (stating that irreparable injury is an essential element for a preliminary injunction). Given this omission on an essential element of a preliminary injunction, I would affirm the denial rather than treat the ruling as moot.